## State of Vermont v. Michael B. Petruccelli

[743 A.2d 1062]

No. 98-106

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed September 24, 1999

*William H. Sorrell,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Peter F. Langrock* and *Kevin E. Brown* of *Langrock Sperry & Wool,* Middlebury, for Defendant-Appellant.

**Amestoy, C.J.** Following a bench trial in Windham District Court, defendant Michael Petruccelli was convicted of kidnapping, aggravated assault, custodial interference, and two charges of simple

assault on an officer. On appeal, defendant argues that (1) as joint guardian of his child, he could not be guilty of custodial interference or kidnapping; (2) evidence supporting assault charges should have been suppressed as stemming from an unconstitutional warrantless entry of his home; and (3) the State failed to prove the correct mens rea standard for the aggravated assault charge. We vacate the custodial interference conviction, and affirm the four remaining convictions.

The trial court found that on October 23, 1994, police were called to the residence of defendant Michael Petruccelli and his girlfriend, Heidi Dlubac, to investigate a domestic disturbance. Two officers found defendant outside his condominium unit and encountered Dlubac walking along a roadway nearby. Dlubac told officers that she and defendant had been fighting over defendant's contacts with his ex-girlfriend. The disagreement had escalated to a physical altercation. Dlubac had told defendant that she wanted to leave him, and take the couple's five-week old baby, Kristen, with her. Outside the condominium, the two had argued over who would take the baby. Dlubac indicated to the officers that she was tired of being abused by defendant and wanted to leave, but defendant would not allow her to take the baby. She returned to the condominium with the officers, and entered the residence to attend to the baby. An officer saw defendant in the front yard and informed him that, as the couple was unmarried, Dlubac had the right to take the baby with her, and defendant had no right to interfere, even though he was the natural father of the child. Defendant disagreed and threatened to kill Dlubac or anyone else who tried to take the baby away, and then kill himself. Defendant became increasingly agitated and stated he did not care if Dlubac left, but would prevent anyone from taking the child. He then went inside the condominium. A German Shepard blocked entry to the condominium. A posted sign read "guard dog on duty."

The police remained outside and conversed with Dlubac through a bedroom window. She reported that defendant was loading clips into a .22 caliber rifle. One officer recommended that while defendant was in the next room, Dlubac get the baby and pass her through the window. Dlubac responded that she could not, as she feared defendant's reaction. She suggested that the officers leave and that she would escape with Kristen at a later time. Believing that there would be a dangerous confrontation between the defendant and Dlubac if they left, officers continued to monitor the situation. Through the window, officers were able to hear Dlubac tell defendant to stop threatening her.

Officers proceeded to the entrance of the condominium. Dlubac's mother arrived and tried to persuade defendant to allow Dlubac to leave with the baby, but was unsuccessful. At one point, Dlubac opened the front door with the baby in her arms, but defendant came from behind her, seized the baby, and attempted to shut the door. An officer put his foot in the doorway to hold it open, but defendant struggled and closed the door. After warning Dlubac, officers attempted to forcibly enter. As the officers entered, the dog remained in the living area in a crouched position baring its teeth and growling at the officers. Officers sprayed the dog with pepper spray, and Dlubac pulled the dog into the bathroom and left the condominium. As officers entered, defendant went into a back bedroom with the baby and closed the door.

Positioned on either side of the bedroom door, officers with weapons drawn reminded defendant that no one had yet been hurt, and insisted he surrender. Defendant responded with obscenities and ordered the officers to leave. Officers heard the action of a firearm, and defendant yelled, "I'm locked and loaded and I'm coming out." He opened the door and slowly emerged with the baby in one arm and the rifle at a forty-five degree angle toward the ceiling in the other. One officer grasped the rifle, and a struggle ensued, during which a shot was discharged into the floor. An officer seized the gun, while other officers continued to grapple with defendant, who retreated into the bedroom with the baby. Defendant released the baby onto the bed, and an officer carried the baby out of the room to safety. Defendant continued to resist against three officers, two of whom were cut during the struggle. After defendant scraped his teeth against the head of another officer, he was sprayed with pepper spray, but this had no noticeable effect on him. Defendant and officers fell onto the bed, where defendant wrapped his arm around the neck of Officer Merrigan and secured a choke hold. When Officer Merrigan called for help from another officer standing nearby, defendant tightened his grip until Officer Merrigan was unable to breath or speak, and his vision began to fade. Another officer attempted to free Officer Merrigan by pulling on defendant's head and arm, but was unsuccessful. The officers threatened to strike defendant, and as one officer left the room to obtain a baton, defendant loosened his grip and was handcuffed. Officer Merrigan sustained several cuts during the struggle and suffered a sore neck.

Defendant was originally charged with eight crimes, only five of which are relevant to this appeal. Prior to trial, the State dismissed an

unlawful restraint charge and one of three charges of simple assault; upon motion for acquittal at trial, defendant was acquitted of reckless endangerment. After a bench trial in district court, defendant was found guilty of kidnapping, custodial interference, aggravated assault, and two charges of simple assault on a police officer. He was sentenced to four-to-six years for kidnapping, and up to two years for custodial interference to run concurrently with the kidnapping sentence. Consecutive to the above sentence, defendant was also sentenced to serve concurrently two-to-three years for the aggravated assault conviction and up to a year each for the simple assault convictions.

Defendant appeals the denial of his motion for acquittal on the custodial interference and kidnapping charges, arguing that as lawful guardian of Kristen, he could not, as a matter of law, be convicted of those crimes. Defendant renews his argument, first presented during a pretrial motion to suppress, that the police officers' warrantless entry into his home violated both the Fourth Amendment of the United States Constitution and Article Eleven of the Vermont Constitution. Defendant claims that because the evidence obtained once the officers entered the condominium is the fruit of a warrantless entry and therefore should have been suppressed, the district court erred in denying defendant's motion for acquittal on the aggravated and simple assault charges. On the aggravated assault charge, defendant alternatively argues that the court erred in denying his motion for acquittal because the State failed to prove defendant acted with the requisite intent to sustain a conviction.[1]

Prior to trial and at the close of the State's evidence, defendant moved to dismiss the kidnapping and custodial interference charges on the grounds that he had established the requisite "custodial, personal, or financial relationships with [the baby] to have acquired the status of her lawful custodian." Defendant reasserts the argument on appeal contending that as a biological father who has accepted the responsibilities of parenthood, he is "constitutionally imbued" with the de facto status of a father of a child born in wedlock. See *In re*

---

[1] Defendant argues that portions of the State's brief to this Court should be stricken from the record because it improperly cites to pretrial transcripts for support of the trial court decision. Although the "statement of the facts" section of the State's brief cites to transcripts of the pretrial hearing on defendant's motions to dismiss and to suppress evidence, the factual propositions referenced are mirrored in the trial court's findings of fact. As we rely on the findings of fact from the trial court, defendant's motion to strike portions of the State's brief from the appellate record is denied.

*S.B.L.*, 150 Vt. 294, 304, 553 A.2d 1078, 1086 (1988). If defendant is found to possess the same status as the father of a child born in wedlock, defendant argues he "necessarily qualifies" as a "lawful custodian" of the baby, pursuant to 13 V.S.A. § 2404(1) (lawful custodian is a "parent, guardian or other person responsible by authority of law for the care, custody or control of another"). A determination of defendant's qualification to be the baby's lawful guardian is critical because according to defendant's theory of defense to the kidnapping and custodial interference charges, a lawful custodian cannot be convicted of either crime under the facts of this case.[2]

We disagree that the issue of defendant's criminal culpability for the crimes of kidnapping and custodial interference turns on his status as lawful custodian of the baby. We conclude that the facts proved beyond a reasonable doubt in this case are legally sufficient to support defendant's conviction for kidnapping regardless of whether he was the baby's lawful custodian. We further conclude that those facts are legally insufficient to sustain a conviction for custodial interference — irrespective of whether defendant was the baby's lawful custodian — because the trial court erred in construing the custodial interference statute.

## I. Kidnapping

Defendant was convicted of kidnapping pursuant to 13 V.S.A. § 2405(a)(1)(C), which states in pertinent part: "A person commits the crime of kidnapping if the person (1) knowingly restrains another person with intent to: . . . (C) inflict bodily injury upon the restrained person or place the restrained person or a third person in fear that any person will be subjected to bodily injury." On appeal, we review the denial of the motion for acquittal pursuant to V.R.Cr.P. 29 to determine "whether, taking the evidence in the light most favorable to the state and excluding modifying evidence, the state has produced evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt." *State v. Fanger*, 164 Vt. 48, 51, 665 A.2d 36, 37 (1995).

---

[2] Although defendant argues that the lawful custodian analysis is relevant to both the kidnapping and custodial interference convictions, he most vigorously advances his legal theory with respect to the kidnapping charge. The court imposed the longest sentence (two-to-six years) on the kidnapping conviction. The sentence for custodial interference (up to two years) runs concurrently with the kidnapping sentence.

The State's information charging the crime of kidnapping alleged that "at W. Dover, Vt., [on] 10/23/94, [defendant] did knowingly restrain another person, to wit, Kristen Petruccelli, with intent to place Robert Edwards in fear that a person, to wit, Heidi Dlubac, would be subjected to bodily injury, in violation of 13 V.S.A. § 2405(a)(1)(C)." After a bench trial, the Windham District Court concluded that the State had proven beyond a reasonable doubt that defendant acted knowingly to restrain Kristen Petruccelli with the intent to place Police Chief Edwards in fear that Heidi Dlubac would be subjected to bodily injury. The court found that the State proved beyond a reasonable doubt that defendant restricted the child from the time he took the child into his possession until the time control of the child was taken from him by the officers, a period of at least one and one-half hours. The restriction of movement within the condominium unit for that period of time thus satisfied, in the court's view, the statutory definition of "restrain." See 13 V.S.A. § 2404(3)(C) ("confining the restrained person for a substantial period . . . in the place where the restriction commences").

Defendant does not take exception to the court's finding that defendant confined his daughter for a period sufficient to meet the statutory definition of "restrain," but asserts that the court erred in determining that the restraint was "without consent." Defendant correctly asserts that "restrain" as defined in the kidnapping statute requires that the substantial restriction of the movement of another person be "without the person's consent or other lawful authority." *Id.* § 2404(3). A restraint is "without consent" if it is accomplished "(A) by acquiescence of the restrained person, if the restrained person is under 16 years of age and the restrained person's lawful custodian has not acquiesced in the movement or confinement; *or* (B) by force, threat or deception." *Id.* § 2404(4) (emphasis added).

Contrary to defendant's claim, the issue critical to the kidnapping conviction is not whether defendant was the baby's "lawful custodian." The most salient inquiry is whether the trial court correctly decided that the State proved beyond a reasonable doubt that restraint of the victim was accomplished "without consent." Defendant maintains that as "lawful custodian" he could acquiesce in the confinement of his daughter. See *id.* § 2404(4)(A). We agree, unless the restraint was accomplished "by force, threat or deception." *Id.* § 2404(4)(B).

> [T]he applicability of [the crime of kidnapping] to a case where the abduction of a child is by a parent should not turn

on the interference or noninterference of the parent with formal custody arrangements. A proper kidnapping prosecution can be made out even though the abducting parent is fully entitled to legal custody of the child. Such a case will turn on the presence of "force, threat or deception" together with the remaining elements of the offense. . . .

Model Penal Code and Commentaries § 212.4 comment at 255 n.13 (1980).

■ Although defendant would have us analyze "without consent" by reference only to (A) rather than (B) of § 2404(4), the trial court determined that the "without consent" element of restraint was accomplished by force and threat. Defendant offers no persuasive basis to distinguish *State v. Washington*, 166 Vt. 600, 691 A.2d 583 (1997), where, under similar facts, we declined to consider the defendant's argument that as the child's father he had a right to "acquiesce" in the child's restraint. We upheld the conviction based on an analysis of § 2404(4), and whether there was sufficient evidence of force, threat or deception. There, as here, there was "forcible confinement of the victim for thirty or more minutes during the standoff with the police." *Washington*, 166 Vt. at 601, 691 A.2d at 584. There, as here, the "restraint" was not based on the time defendant physically held the baby "but on the period when he forcibly detained the child to keep the police at bay."[3] *Id.* at 602, 691 A.2d at 585. In *Washington*, as in the case before us, the defendant contended that his threats and use of force were not directed at the child. As we noted in *Washington*, "[n]othing in the statute . . . requires that the threats be directed at, or understood by, the victim. The victim is no less restrained when the confinement is accomplished by threats against another . . . ." *Id.*

Because we conclude that the requisites of § 2404(4)(B) are met, it is unnecessary to consider defendant's claim that he had the lawful authority to "acquiesce" in the restraint. We note again, as we did in *Washington*, that cases from other jurisdictions have generally rejected the argument that a parent may not be held criminally liable for kidnapping. See *id.* (citing cases).

---

[3] The threat of force was, if anything, much greater in the instant case than in *Washington* where the defendant was apparently unarmed. Here, defendant had a loaded firearm with twenty-eight rounds in the ammunition clip and one round in the chamber.

## II. Custodial Interference

The information with respect to the custodial interference charge alleged that "on the twenty-third day of October 1994, [the defendant] did knowingly and without legal right to do so, keep a child, to wit, Kristen Petruccelli, from her lawful custodian, to wit, Heidi Dlubac, in violation of 13 V.S.A. § 2451." As with the kidnapping charge, defendant asserts that the trial court's failure to consider him the "lawful custodian" of the child with respect to the custodial interference charge erroneously deprived him of an absolute defense to criminal liability. We again reject defendant's theory that a finding that he was the child's lawful custodian would provide a safe harbor from criminal prosecution. Modern custodial interference statutes were intended to respond to the increasing occurrence of parental abduction of children as a means to settle a custody dispute or to permanently alter custody. See *Judges Guide to Criminal Parental Kidnapping Cases*, 8 Juvenile & Family Court Journal 1-3 (1997). We agree with the view that "[t]he crime of custodial interference was designed to protect any custodian from deprivation of his or her custody rights — even if that deprivation results from the actions of a person who also has a right to physical custody of the child." *Strother v. State*, 891 P.2d 214, 220-21 (Alaska 1995).

In reviewing the sufficiency of the evidence necessary to sustain a conviction for custodial interference in this case, we look not to defendant's assertion that he is the child's "lawful custodian" — which for purpose of our analysis we will assume arguendo — but to defendant's conduct in relation to the elements of the crime. See *id.* at 221 ("The crime [of custodial interference] does not focus on the legal status of the defendant, but rather focuses on the defendant's actions, the effect of the defendant's actions, and the intent with which those actions were performed.").

The elements of the offense of custodial interference include "(1) an intentional (2) taking, enticing away, keeping, or withholding which (3) unlawfully deprives the custodian of custody." *State v. Doyen*, 165 Vt. 43, 50, 676 A.2d 345, 348 (1996). For the trial court to find defendant guilty of custodial interference on the facts proved at trial, it was necessary, as the trial court noted, to give the word "keep" a "broad interpretation." The trial court interpreted "to keep" to mean "to prevent the legal custodian from exercising physical control over the child." That definition is overly broad and inconsistent with an essential element of custodial interference: unlawfully depriving the custodian of custody of the child. Cf. *State v. Edmisten*, 674 S.W.2d

576, 577 (Mo. Ct. App. 1984) (explaining that defendant's construction of word "take" in interference with custody statute would "blatantly frustrate" statute's purpose to protect court-ordered custody against unlawful interference).

The trial court's interpretation of the reach of the custodial interference statute is particularly problematic in this case where the State chose to charge kidnapping and custodial interference on the same set of facts. While in some cases it may be appropriate to prosecute both for kidnapping and custodial interference, see, e.g., *People v. Campos*, 182 Cal. Rptr. 698 (Ct. App. 1982); *People v. Metcalf*, 926 P.2d 133 (Colo. Ct. App. 1996), the enactment of Vermont's custodial interference statute was intended to create criminal liability for parental abductions of children that were evading prosecution under the kidnapping statute. See Hearing on H. 724 before the House Judiciary Committee, January 23, 1980, at 35 (statement of Rep. Ketcham). Kidnapping involves restraint without lawful authority with the commission of some other act, such as a demand for ransom, use of the restrained person as a shield, or the placement of a person in fear that any person will be subjected to bodily injury. See 13 V.S.A. § 2405(a)(1). The penalty for kidnapping is severe — a maximum sentence of life imprisonment and fine of $50,000. See *id.* § 2405(b).

Custodial interference, by comparison, generally occurs when a parent takes his or her child, or fails to return the child following a court-ordered visitation period, in a manner that prevents the other custodial parent from having contact with the child. See, e.g., *Doyen*, 165 Vt. at 53, 676 A.2d at 350 (father properly charged with custodial interference for leaving state with child and failing to return child to mother in Vermont at end of visitation period established by court order). In most states, custodial interference is a felony only if the child is removed from the state for a protracted period of time. See, e.g., N.H. Rev. Stat. Ann. § 633:4 (1996); Del. Code Ann. tit. 11, § 785 (Supp. 1984); see also C. Blakesley, *Child Custody — Jurisdiction and Procedure*, 35 Emory L.J. 291, 361 n.382 (1986).

In the present case, defendant neither failed to comply with a court-ordered custody arrangement nor absconded with the child. His restraint of Kristen was secured by a use of force in the couple's home, which is encompassed by the kidnapping statute, not the custodial interference statute. The threats and use of force, which the trial court found to have prevented the mother from "exercising physical control over the child," are precisely those acts which the

State relied upon to prove the crime of kidnapping. Defendant did not evade prosecution under the kidnapping statute; the State proved that defendant knowingly restrained Kristen Petruccelli with the intent to place Officer Edwards in fear that Dlubac would be subjected to bodily injury in violation of 13 V.S.A. § 2405(a)(1)(C). The State, however, did not prove defendant intentionally kept Kristen Petruccelli to unlawfully deprive Heidi Dlubac of custody within the meaning of the custodial interference statute. We therefore vacate the custodial interference conviction. See *State v. Ward*, 151 Vt. 448, 452, 562 A.2d 1040, 1042 (1989) (fundamental error so detrimental to defendant's rights as to constitute plain error may be addressed even though neither party nor trial court discerned nature of defect).

### III. Warrantless Entry of Defendant's Home

■ Defendant argues next that the police officer's warrantless entry into his home violated the Fourth Amendment of the United States Constitution and Article Eleven of the Vermont Constitution. Absent a valid warrant, police intrusion of the home is justified only when the government demonstrates the presence of "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); see also *United States v. Alexander*, 923 F. Supp. 617, 622 (D. Vt. 1996) ("The Government bears the burden of proving the existence of such an exigency to justify warrantless searches.").

We consider the totality of the circumstances when determining whether exigent circumstances are present sufficient to justify a warrantless entry into the home. See *State v. Girouard*, 135 Vt. 123, 131, 373 A.2d 836, 842 (1977). We are further guided by the six factors set forth in *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc). See *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992) (adopting the *Dorman* factors for the Second Circuit). We consider whether: (1) a grave offense, particularly a crime of violence, is involved; (2) the suspect "is reasonably believed to be armed"; (3) police had "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) police had "strong reason to believe that the suspect is in the premises being entered"; (5) there is "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the entry was made peaceably. *Id.*

These factors are not exclusive, however. In *United States v. Alexander*, 923 F. Supp. at 623, the court observed that the factors

used to determine exigency are illustrative, not determinative, and "there may be circumstances in which the presence of one factor alone can justify a warrantless entry." This is such a case. Police encountered defendant in front of his condominium, having been called there to investigate a domestic disturbance. At the point at which officers decided the circumstances required warrantless entry into the condominium, defendant was inside with Dlubac and the baby and had threatened to kill Dlubac or anyone else who tried to take the baby. Through a window, officers had heard Dlubac tell defendant to stop threatening her. Defendant had physical control over the baby and, while in an extremely agitated state, was carrying a loaded .22 caliber rifle. Although several of the *Dorman* factors assessing the constitutionality of warrantless entry are also present, defendant's threats of violence and the means to carry out the threats presented sufficiently exigent circumstances for a warrantless entry.

 Defendant also argues the warrantless entry of his home violated Article Eleven of the Vermont Constitution, which may offer protection against unreasonable search and seizure beyond that of the Fourth Amendment. See *State v. Savva*, 159 Vt. 75, 84, 616 A.2d 774, 779 (1991). Warrantless searches are permitted only in those extraordinary circumstances "which make the warrant and probable-cause requirement impracticable." *State v. Welch*, 160 Vt. 70, 78, 624 A.2d 1105, 1110 (1992). Exceptions to the warrant requirement "must be factually and narrowly tied to exigent circumstances and reasonable expectations of privacy." *Savva*, 159 Vt. at 87, 616 A.2d at 781. Here, the occasion for arrest arose while police were already at the scene, where they heard defendant threaten to kill Dlubac and abscond with the baby. The immediate threat of danger to Dlubac, considered in light of the substantial time it would have taken to prepare the warrant application and affidavits, locate a magistrate judge on Sunday, and drive to obtain the warrant, made obtaining a warrant impractical. We affirm the trial court's conclusion that the officers did not violate defendant's federal or state constitutional rights when they entered the house without a warrant, and did not err by refusing to suppress evidence derived therefrom, nor by denying the motion for acquittal on the three assault charges.

## IV. Mens Rea Standard for Aggravated Assault

Defendant argues next that the trial court erred in denying his motion for judgment of acquittal on the aggravated assault charge

because "a person cannot recklessly attempt to commit a crime" or, in the alternative, the State failed to produce sufficient evidence of recklessness to establish defendant's intent to commit the crime.

Defendant was charged with violation of subsection (a)(1) of the aggravated assault statute, which reads in pertinent part: "[a] person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 13 V.S.A. § 1024(a)(1).

In determining that the State had proved beyond a reasonable doubt defendant's culpability for aggravated assault, the trial court found:

> The evidence . . . shows clearly that the Defendant's conduct, applying the force that he did, and continuing that to the extent that Officer Merrigan was unable to breathe, see or speak convinces the Court the State has met its burden of proof that the conduct of the Defendant created a substantial risk of death. The State, in fact, has proven the causing of serious bodily injury as that is defined and gone beyond proof merely of an attempt to do so.

In light of the trial court's finding that the State proved the completed crime of aggravated assault rather than attempted aggravated assault, we fail to see the relevance of defendant's claim that one cannot be convicted of "reckless attempt." A person who causes serious bodily injury "recklessly under circumstance manifesting extreme indifference to the value of human life" cannot be distinguished from a person who causes injury "purposely" or "knowingly." *State v. LaClair*, 161 Vt. 585, 587, 635 A.2d 1202, 1204 (1993). While it is true that the State's legal theory of its prosecution of defendant for aggravated assault was that defendant's culpability would be demonstrated by evidence of his attempt to cause bodily injury rather than recklessly causing such injury, defendant suffered no prejudice since "[t]he attempted commission of a criminal offense involves the same mental intent as would be required in the actual commission of that offense." *State v. Dennis*, 151 Vt. 223, 224, 559 A.2d 670, 671 (1989). Defendant was charged with aggravated assault, and "it is to that crime one must look in identifying the kind of intent required." *Id.*

Nor are we persuaded by defendant's alternative argument that regardless of whether the appropriate mens rea standard of § 1024 includes recklessness, the evidence was insufficient to establish that

defendant acted with the intent to commit aggravated assault. Both defendant's words and conduct demonstrate his decided objective to, at least, cause substantial bodily harm to Officer Merrigan. Defendant repeatedly expressed his intent to kill anyone who interfered with his control of Kristen, and confronted officers with a loaded rifle. As defendant choked him, Officer Merrigan signaled to the other officers that he could not breathe. Defendant then tightened his grip such that Officer Merrigan's vision began to fade. Not until officers threatened to strike defendant with a baton did he release the officer.

■ The State has the burden of proving that "defendant acted with the conscious object of causing serious bodily injury or that he acted under circumstances where he was practically certain that his conduct would cause serious bodily injury." *State v. Blakeney*, 137 Vt. 495, 501, 408 A.2d 636, 640 (1979). Given the facts and circumstances prior to the choking incident, and assuming defendant intended the natural and probable result of his actions, the State's evidence is sufficient to fairly and reasonably support a finding of guilt beyond a reasonable doubt. See *State v. Sage*, 161 Vt. 633, 635, 641 A.2d 115, 116 (1994) (standard of review on appeal regarding sufficiency of the evidence is whether the evidence, when viewed in a light most favorable to the State and excluding any modifying evidence, is sufficient to fairly and reasonably support a finding of guilt beyond a reasonable doubt).

*Judgment of acquittal for custodial interference entered. Judgment affirmed in all other respects.*