2007 VT 34

# State of Vermont v. Patricia O'Dell

[924 A.2d 87]

No. 04-411

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 4, 2007

*William D. Wright*, Bennington County State's Attorney, and *Andrew G. Costello*, Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant appeals her convictions for attempting to impede a police officer and custodial interference, arguing that there was insufficient evidence on the first charge and that conviction under the second charge was legally impossible. We affirm.

¶ 2. On September 13, 2002, the Bennington Family Court issued three emergency detention orders granting the Department for Children and Families (DCF)[1] custody of defendant's children due to alleged educational neglect. Two DCF employees and several law enforcement officers went to defendant's mother's house in an attempt to locate the children and execute the detention orders. Upon arrival, a DCF employee attempted to explain the orders to defendant. Defendant refused to release the children into DCF custody and would not allow anyone into the house without a warrant. Over the course of approximately two hours, defendant intermittently came in and out of the house, speaking with police and DCF workers, but continued to refuse entry. One law enforcement officer left to obtain a search warrant.

¶ 3. While waiting for the warrant, a police officer noticed one of defendant's children behind the house. Police officers began to chase the child, and defendant followed them. Defendant concedes that during this chase she made contact with an officer and then fell over herself. At this point, police arrested defendant. She was charged with attempting to impede a police officer under 13 V.S.A. § 3001, and custodial interference under 13 V.S.A. § 2451(a). At trial, defendant moved for acquittal pursuant to Vermont Rule of Criminal Procedure 29(a), arguing that there was insufficient evidence to demonstrate that she impeded the officer and that she did not receive proper notice of the detention orders. The district court denied the motion, and the jury returned a verdict of guilty on both counts.

¶ 4. On appeal, defendant first argues that the district court erred in denying her motion for acquittal because there was insufficient evidence to support the charge of attempting to impede an officer. Specifically, defendant claims that there was insufficient evidence to prove that she knowingly and purposefully pushed a police officer to prevent him from pursuing her child. In reviewing a denial of a motion based on insufficiency of the evidence, we view the evidence in the light most favorable to the State, excluding any modifying evidence, and determine whether it is sufficient to fairly and reasonably convince a

---

[1] At the time, the agency was called Social and Rehabilitation Services.

trier of fact that the defendant is guilty beyond a reasonable doubt. *State v. Burnham*, 145 Vt. 161, 165, 484 A.2d 918, 921 (1984). Here, the trooper testified that while he was attempting to pursue the child, defendant pushed him with her hands, causing him to lose his balance. The trooper further testified that the push was not a result of defendant tripping. The jury also heard defendant's version of events and was instructed on the defense of mistake. From the evidence presented, the jury could conclude that defendant's actions were purposeful beyond a reasonable doubt. Thus, the motion for acquittal was properly denied.

¶ 5. Defendant's second argument is that it is legally impossible for her to be convicted of custodial interference because DCF is not a "lawful custodian" within the meaning of the statute. Because defendant did not raise this issue in the district court, we review for plain error. V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

¶ 6. Custodial interference is defined as "taking, enticing or keeping a child from the child's lawful custodian, knowingly, without a legal right to do so, when the person is a relative of the child and the child is less than eighteen years old." 13 V.S.A. § 2451(a). In addition, the preceding chapter on kidnapping defines lawful custodian as "a parent, guardian or other person responsible by authority of law for the care, custody or control of another." *Id.* § 2404. Based on this definition, defendant argues that DCF is not a person, and, thus, not a "lawful custodian" under the statute. Further, defendant maintains that the custodial interference statute was enacted to respond to parental abduction cases and that the Legislature did not intend for the crime to apply in situations where a parent takes or keeps a child, who is lawfully in DCF custody.

¶ 7. In interpreting statutes, "our goal is to give effect to the intent of the Legislature, and to do so we first look at the plain, ordinary meaning of the statute." *State v. Eldredge*, 2006 VT 80, ¶ 7, 180 Vt. 278, 910 A.2d 816. When the plain language is clear and unambiguous, we enforce the statute according to its terms. *Id.*

¶ 8. Upon examination of the statute's language, we conclude that "lawful custodian" includes state agencies, such as DCF. The statute broadly defines "lawful custodian" to include parents, guardians, or other persons responsible by authority of law. We disagree that DCF is excluded from this definition because it is not an individual. Statutes employ the term "person" to refer to entities other than individuals; indeed, the Vermont statutes generally define "person" to include "the

state of Vermont or any department, agency or subdivision of the state." 1 V.S.A. § 128. Moreover, in numerous decisions we have recognized that DCF serves as the legal custodian of children, like defendant's children here, who are ordered into its custody. See, e.g., *In re E.L.*, 171 Vt. 612, 613, 764 A.2d 1245, 1247 (2000) (mem.) (recognizing that SRS, as legal custodian, has authority to place a child who is in its custody). In addition, we note that, to the extent other courts have addressed this question, they have also found that state agencies may act as lawful custodians within the meaning of a custodial interference statute. See *State v. Gambone*, 763 P.2d 188, 190 (Or. Ct. App. 1988) (affirming defendant's conviction for custodial interference where defendant removed children from custody of Children's Services Division); see also *State v. Whiting*, 671 P.2d 1158, 1160-61 (N.M. Ct. App. 1983) (concluding that district court is a "person" that may be vested with legal custody).

¶ 9. Briefly, we address defendant's contention that the Legislature did not intend for the custodial interference statute to apply to situations where a parent keeps or removes a child from lawful DCF custody. As described above, the statute defines legal custodian broadly, and we refuse to read limitations into the usual and apparent meaning of the statute that the Legislature has not provided. Furthermore, we conclude that applying the statute in circumstances where DCF has legal custody is entirely consistent with the statute's purposes. The purpose of the custodial interference statute is to protect any custodian from deprivation of his or her rights, even if such deprivation results from the actions of a person who has a right to physical custody. *State v. Petruccelli*, 170 Vt. 51, 59, 743 A.2d 1062, 1068 (1999). In addition, the statute is designed to protect children, who are victims in these cases and suffer detrimental effects from wrongful taking or withholding. See *State v. Wootten*, 170 Vt. 485, 491-92, 756 A.2d 1222, 1226 (2000) (explaining that children are victims in parental abduction cases). Although the more typical case of custodial interference may involve one parent depriving another of custody, under this statute the welfare of the children must be recognized as paramount. There is a risk to children when they are wrongfully detained, whether unlawfully taken from one parent or unlawfully kept from DCF executing a judicially approved protective order. See *id.* (listing how children suffer from custodial interference); see also *Gambone*, 763 P.2d at 188-89 (describing how mother committed custodial interference by taking children from protective custody).

■ ¶ 10. Here, the family court, in the interests of the children's welfare, issued an order transferring legal custody of the minor children to DCF. DCF was the "legal custodian" of the children when defendant refused to allow DCF workers to take the children into their protection. Thus, we disagree with defendant that it was legally impossible for her to commit custodial interference, and we affirm her conviction.

■ ¶ 11. Finally, we respond to the dissent's argument that it was impossible as a matter of law for defendant to form the requisite intent for custodial interference because she was extremely emotional and upset. We disagree that there was insufficient evidence to submit the question of intent to the jury. See *State v. Hanson*, 141 Vt. 228, 233, 446 A.2d 372, 375 (1982) (explaining that standard for sufficiency of the evidence is "whether the evidence, viewed in the light most favorable to the State, is sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt."). There was evidence presented to the trial court to demonstrate that defendant was aware that DCF was the lawful custodian of her children. Both DCF employees and police officers testified that they showed defendant the judge's order and explained to defendant that the court had granted DCF lawful custody of the children. In response, defendant admitted that many people spoke to her about the order and that she remembered receiving a copy of the order, but countered that she was too upset to look at it. Thus, the question of defendant's intent "was properly a matter for the jury to decide, based on all the evidence before it." *Id.* at 233, 446 A.2d at 375. Although presented as a legal deficiency, the dissent's position that defendant had "neither the time nor the circumstances" to understand the significance of the protective order is a disagreement with the jury's factual findings. *Post*, ¶ 19. The jury, as the finder of fact, must resolve contradictions and decide who to believe. *State v. Riley*, 141 Vt. 29, 33, 442 A.2d 1297, 1299 (1982). In this case, the jury heard all the testimony, was properly instructed on the elements of the charge, and, based on the evidence, found defendant guilty. We find no basis to disturb that result.

*Affirmed.*

¶ 12. **Johnson, J.,** dissenting. On the afternoon of Friday, September 13, 2002, case workers from the Department for Children and Families (DCF) appeared at mother's home accompanied by six to eight police officers and told mother they were going to take her children. She had received no prior notice that DCF had been granted temporary custody

of the children or that DCF planned to pick them up that day. Rather, mother learned that DCF intended to take her children at the very moment the case workers and police showed up at her home. There are valid reasons for DCF to choose to pursue an ex parte emergency detention order in particular cases. The question here, however, is whether a parent under such circumstances can formulate the requisite intent — to knowingly keep the children from a lawful custodian (here, DCF) — such that she may be found guilty of custodial interference as defined by 13 V.S.A. § 2451(a). I believe that, under the precipitous and chaotic circumstances presented by this case, it was impossible as a matter of law for mother to form the culpable state of mind associated with the crime of custodial interference. Because an element of the offense was not supported by the evidence, mother should have been acquitted on this charge.[2] Accordingly, I dissent from the portion of the majority affirming her conviction for custodial interference.

¶ 13. It is important to note at the outset that there was no allegation that the children in this case were threatened by imminent harm. Rather, the emergency detention orders were issued on the basis of alleged educational neglect (namely, the contention that mother refused to enroll the children in public school and was not qualified to home-school them). A hearing on these allegations was scheduled for Monday, September 16, 2002; DCF sought emergency detention orders the Friday before. Significantly, the orders were obtained through an ex parte proceeding. In other words, mother did not receive notice of the proceeding, did not participate in it, and had no way of knowing that DCF had been granted custody of the children by a judge — that is, until the moment DCF case workers arrived at her home.

¶ 14. When they arrived, the case workers brought with them Vermont state troopers as well as Bennington police officers. The case workers attempted to explain to mother that DCF had been granted temporary custody of the children pending the hearing, and that she would see them again at the hearing. Understandably, mother became extremely upset when told that DCF was there to take her children.

---

[2] While mother did not present this argument on appeal (other than to contend that application of the custodial interference statute to the facts of this case exceeded the purpose of the statute), it was the centerpiece of her defense at trial. Further, as an issue of law that goes to the heart of whether criminal liability exists in this case, failure to consider the argument would not serve the interests of justice. *State v. Mears*, 170 Vt. 336, 341, 749 A.2d 600, 604-05 (2000) (plain error exists where failure to recognize error would result in miscarriage of justice).

She brought her children inside the house and refused to hand them over to DCF or the police. She insisted that the police obtain a warrant before she would allow them inside. In general, mother was very emotional from the moment the case workers and police arrived at the home.

¶ 15. It was in this charged and chaotic atmosphere that DCF case workers and the police attempted to explain to mother why they were there and the reason her children were being taken. The case workers conceded in their testimony that they were not able to communicate calmly and effectively with mother under the circumstances. Similarly, one of the state troopers testified that when he attempted to show mother the detention order, she refused to look at it. The trooper explained that, "it wasn't a situation where I could calmly read some-one an order and I could . . . get good communication going with that person. It just didn't work."

¶ 16. Given the difficulty that the DCF case workers and police officers had in attempting to communicate with mother, and the fact that she had no notice of DCF's custody prior to that Friday afternoon, the critical question is whether she even had the opportunity to form the intent necessary to commit the crime of custodial interference. "[O]ne of criminal law's most basic principles is that a person is not criminally liable for causing a bad result if he or she did not have some culpable mental state with respect to that result." *State v. Trombley*, 174 Vt. 459, 460, 807 A.2d 400, 403 (2002) (mem.) (quotations omitted). The culpable mental state for purposes of the crime of custodial interference is that the defendant acted "knowingly":

> A person commits custodial interference by taking, enticing or keeping a child from the child's lawful custodian, know-ingly, without a legal right to do so, when the person is a rela-tive of the child and the child is less than eighteen years old.

13 V.S.A. § 2451(a). A person acts "knowingly" when:

> (i) if the element involves the nature of his conduct or the at-tendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practi-cally certain that his conduct will cause such a result.

Model Penal Code § 2.02(2)(b); see *Trombley*, 174 Vt. at 461 n.1, 807 A.2d at 403 n.1 (referring to Model Penal Code definition of "know-ingly" in context of crime of assault). In this case, the critical inquiry is

whether mother was aware of "the attendant circumstances" that would make her behavior criminal — namely, that DCF was a "lawful custodian" of the children.

¶ 17. The statute defines "lawful custodian" as "a parent, guardian or other person responsible by authority of law for the care, custody or control of another." 13 V.S.A. § 2404. A key component of this definition is that the custodian is "responsible [for the child] *by authority of law.*" *Id.* (emphasis added). Thus, in *State v. Petruccelli* we concluded that the defendant — who held his five-week-old daughter hostage at gunpoint and refused to surrender her to either the girl's mother or police — was not guilty of custodial interference because he "neither failed to comply with a court-ordered custody arrangement nor absconded with the child."[3] 170 Vt. 51, 60, 743 A.2d 1062, 1069 (1999) (affirming his conviction for the separate crime of kidnapping). In the absence of such evidence, "[t]he State . . . did not prove [the] defendant intentionally kept [the child] to unlawfully deprive [the girlfriend] of custody within the meaning of the custodial interference statute." *Id.* at 61, 743 A.2d at 1069. In the instant case, while there was a valid court order in place, the question is whether mother had a meaningful understanding of this fact such that she could be said to have "knowingly" deprived DCF of custody. If not, this defeats the charge.

¶ 18. On that point, it is instructive to compare the facts presented to us here with those in *State v. Wootten,* 170 Vt. 485, 756 A.2d 1222 (2000). There, the mother had established visitation rights by court order, but when she went to pick the children up, the father had fled the state with them. *Id.* at 487, 756 A.2d at 1223. The father subsequently evaded service of the court's custody order for years on end by repeatedly moving with the children to different states and adopting a false identity. *Id.* When he was eventually located and charged with custodial interference, father argued that he could not have "knowingly" deprived the mother of custody because he was never officially served with the court order. The trial court concluded that there was substantial evidence that the father was nonetheless aware of the court order, and we agreed that "knowledge" for purposes of the crime of custodial interference could be either actual or constructive.[4] *Id.* at 495, 756 A.2d at 1228-29.

---

[3] Similarly, in the instant case mother did not attempt to abscond with the children. Rather, she retreated into her home and insisted that police obtain a warrant to enter.

[4] We did not rule on the merits of this issue as the trial court had dismissed the action on other grounds, which we reversed.

¶ 19. Here, although there were undeniably numerous attempts to get mother to recognize that the State had been granted legal custody of her children,[5] there is no direct evidence that mother knew that the State was a "lawful custodian," and the circumstances surrounding the incident do not support such an inference. To begin with, it is undisputed that, because the emergency detention orders were issued ex parte, mother was not aware that DCF had been granted custody of her children before the case workers showed up at her home and attempted to explain this to her. Mother acknowledged in her testimony that one of the DCF case workers told her that "she had a judge's order or something to pick up my kids." Even assuming, however, that mother on some level understood that a court had issued an order allowing DCF to "pick up [her] kids," this is different from understanding the full import of the concept of legal custody. While it is true that a valid court order was waved in her face, neither the time nor the circumstances existed for mother to understand the significance of that order and make a meaningful choice about whether to comply with it.

¶ 20. The scenario faced by mother in this case stands in marked contrast to the typical circumstances present in cases of custodial interference. In fact, all of our decisions interpreting the statute address situations where one parent has denied custody to another in violation of a family court custody order. See, e.g., *Wootten*, 170 Vt. at 486-87, 756 A.2d at 1223 (father fled state with children to avoid court-ordered visitation with mother); *State v. Doyen*, 165 Vt. 43, 45, 676 A.2d 345, 345 (1996) (father failed to return daughter to mother, who was custodial parent, at end of court-ordered visitation period and traveled with daughter to several other states).[6] And indeed, this is precisely the scenario the statute was intended to address.

¶ 21. As we emphasized in *Petruccelli*, "[m]odern custodial interference statutes were intended to respond to the increasing occurrence of

---

[5] The State emphasized at trial that service is not required for an emergency detention order to take effect. Nonetheless, the fact that mother was not formally served with the order is further evidence that mother did not have the opportunity to fully understand the situation. It is true that the child comes into custody of the State as soon as the judge signs the detention order, but it is not necessarily the case that the parent becomes aware of this fact at the same time — quite the opposite when the order is issued ex parte, as it was here.

[6] In addition, when enacting the statute, the Legislature discussed only cases of parental kidnapping as examples of instances where the statute would be applied. DCF was not mentioned or considered as a "lawful custodian" in connection with the offense.

parental abduction of children as a means to settle a custody dispute or to permanently alter custody." 170 Vt. at 59, 743 A.2d at 1068. In particular, Vermont's custodial interference statute was enacted "to create criminal liability for parental abductions of children that were evading prosecution under the kidnapping statute." *Id.* at 60, 743 A.2d at 1069. We noted that in contrast to the crime of kidnapping, "[c]ustodial interference ... generally occurs when a parent takes his or her child, or fails to return the child following a court-ordered visitation period, in a manner that prevents the other custodial parent from having contact with the child." *Id.*

¶ 22. Accordingly, the elements of the crime focus not on the legal status of the defendant "'but rather focus[] on the defendant's actions, the effect of the defendant's actions, and the intent with which those actions were performed.'" *Id.* at 59, 743 A.2d at 1068 (quoting *Strother v. State*, 891 P.2d 214, 221 (Alaska Ct. App. 1995)). If we analyze these factors with respect to the facts of the instant case, it is apparent that mother's actions fall outside the ambit of custodial interference. In terms of her actions, mother took her children protectively inside her home — she did not attempt to abscond with them. In terms of the effect of her actions, she at most delayed DCF taking custody — there was no real threat that DCF would be thwarted altogether. Finally, in terms of her intent, all of the testimony from the witnesses to the incident indicates that mother was reacting hastily and defensively to the sudden appearance of DCF case workers and police officers, rather than being motivated by an affirmative intent to defy a court order.

¶ 23. The precipitous circumstances of a state agency showing up at a parent's home with a court order is quite different from the scenario of parental kidnapping that inspired the enactment of custodial interference statutes and that is the subject of our decisions interpreting the offense. In cases of parental kidnapping, the court order is typically issued in the context of ongoing divorce or custody proceedings so that even if a parent evades service of a specific order, there are circumstances from which we can infer knowledge of the existence of court-ordered custody arrangements, and further infer that defiance of such an order is done "knowingly." These circumstances simply do not exist in this case. I would reverse the conviction for custodial interference.

¶ 24. I am authorized to state that Justice Skoglund joins this dissent.