NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 67

No. 2017-270

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Liana M. Roy | November Term, 2017 |

William D. Cohen, J.

Alexander Burke, Deputy State's Attorney, Bennington, for Plaintiff-Appellant.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Davenport, Supr. J. (Ret.), Specially Assigned

¶ 1.     **ROBINSON, J.**    The central question in this case is whether a parent may be convicted of custodial interference under 13 V.S.A. § 2451 for interfering with the custody of the Department for Children and Families (DCF) in the absence of a court order specifying the schedule and limitations of the parent's visitation. Defendant Liana Roy was convicted of custodial interference for taking her four-year-old daughter, who was then in DCF custody, on a two-day trip out of the state without DCF's permission. After the jury returned its verdict, the trial court granted defendant's motion for a judgment of acquittal, concluding that, in the absence of a court order specifying defendant's parent-child contact, defendant was not criminally liable. We hold that § 2451 does not require such an order and that the evidence of defendant's knowing and

egregious actions in derogation of DCF's custodial rights support her conviction. Accordingly, we reverse.

¶ 2. The State presented the following evidence at trial. In October 2015, the family division of the superior court assigned conditional custody of defendant's juvenile daughter D.B.[1] to D.B.'s maternal grandfather in Bennington, Vermont. In January 2016, the court vacated this conditional custody order and assigned temporary custody of D.B. to DCF. D.B.'s physical placement remained with grandfather. The order did not specify the terms of defendant's parent-child contact. DCF assigned D.B.'s case management to a DCF social worker who had authority to make decisions regarding family reunification, physical placement, medical treatment, and education.

¶ 3. The social worker was also in charge of establishing the schedule and framework for defendant's visits with D.B., which she coordinated with defendant. Visits were to be supervised by Easter Seals[2] at the state office building in Bennington on Tuesdays and Thursdays. Defendant could have weekend visits supervised by her mother (D.B.'s maternal grandmother), but these visits had to occur in Bennington.[3] The social worker testified that she spoke with defendant on multiple occasions about these visitation rules; in particular she told defendant that she could not visit D.B. outside of these guidelines and could not bring D.B. out of the state without permission.

¶ 4. In addition, there was a protocol for D.B.'s medical appointments. D.B. had a local pediatrician in Bennington. Defendant could attend these appointments; however, either

---

[1] D.B. was four-years-old at the time of the trial in June 2017.

[2] DCF contracts with Easter Seals to facilitate and supervise visits.

[3] These visits typically occurred in hotel rooms rented by defendant and her mother.

grandfather or Easter Seals had to transport D.B. and supervise the medical appointments. The social worker testified that defendant knew of this arrangement.

¶ 5. This case centers on an incident in March 2016. On the evening of Tuesday, March 29, defendant and grandmother picked D.B. up at grandfather's home and took her to grandmother's home in Lanesborough, Massachusetts. Defendant sent the social worker a text message asking permission for this visit, but the social worker was on vacation and did not respond. On the morning of March 31, 2016, the social worker received a call from D.B.'s preschool that D.B. was absent. She called defendant, who stated that she had brought D.B. to her mother's home in Massachusetts because D.B. had pneumonia and needed medical treatment. The social worker requested that defendant bring D.B. to school by 11:00 a.m. After D.B. failed to arrive by 11:00 a.m., the social worker contacted defendant again and set a new deadline of 1:30 p.m. When D.B. failed to arrive at 1:30 p.m., the social worker called the Bennington Police, who contacted the Lanesborough Police to conduct a welfare check on D.B. The social worker eventually drove to Lanesborough and brought D.B. back to Bennington.[4]

¶ 6. After the State rested its evidence at trial, defendant moved for a judgment of acquittal, V.R.Cr.P. 29, arguing that the evidence failed to demonstrate that she interfered with DCF's custody to a degree necessary for 13 V.S.A. § 2451. At most, defendant argued, this was just "a visit gone bad." The court denied this motion, holding that the State had established a prima facie case.

¶ 7. The defense then presented one witness, D.B.'s grandmother. The grandmother testified that the March 2016 visit was the last in a string of visits to Massachusetts stretching back to before DCF gained custody of D.B. On one such visit in February 2016, defendant and

---

[4] The social worker testified that D.B. did not appear ill on the return trip to Vermont.

3

grandmother took D.B. to Massachusetts for eight days. The grandmother testified that the social worker became aware of this visit after the fact and never told her to discontinue these trips.[5]

¶ 8.    The State called the social worker back to the stand, who said that she had been made aware of the visit to Massachusetts in late February 2016, and she had had several subsequent conversations with defendant regarding the visitation rules and the fact that she could not take D.B. out of the state without permission.

¶ 9.    The State then rested, and defendant renewed her motion for a judgment of acquittal, which the court denied.

¶ 10.    The court instructed the jury that the elements of custodial interference include: (1) defendant, (2) intentionally, (3) took a relative under the age of eighteen, (4) in a manner that unlawfully deprived the custodian of custody. Regarding the fourth element, the court instructed the jury:

> A legal custodian is someone who has legal custody over a person. In this context, a person acts unlawfully if a person violates a specific court order. The parent must have been actually or constructively aware of that court order, and the specific terms. To deprive a legal custodian of custody means more than preventing the legal custodian from exercising physical control over the child. When considering when there's a deprivation, you the jury may consider the amount of time the child was with the mother, or whether the mother attempted to hide the child from the legal custodian.
>
> Legal custody means the legal status created by an order of the court which invests the party of the following rights and responsibilities: the right to routine daily care and control of the child, and determine where and whom the child shall live; the authority to consent to major medical, psychiatric, or surgical treatment of the child; responsibilities to protect and supervise the child; and to provide the child with food, shelter, education, ordinary medical care, and the authority to make decisions which concern the child and have substantial legal significance.

---

[5]    Record evidence shows that grandmother and the social worker spoke with some regularity.

4

After deliberating briefly, the jury found defendant guilty.

¶ 11. Defendant subsequently moved to set aside the verdict, V.R.Cr.P. 29(c), or for a new trial, V.R.Cr.P. 33. She argued that "[o]ther than DCF's request that [she] return her daughter to Vermont from Massachusetts, there is no particular part of the custody order that specifically puts [her] on notice that she [was] acting in violation of the authority of the legal custodian." As such, defendant contended, the State had "failed to demonstrate that [she] had the requisite intent to deprive or interfere with DCF's authority as a legal custodian."

¶ 12. The State responded by arguing that, considering the set schedule and rules for visits and medical appointments, there was enough evidence to persuade the jury "that defendant knew she could not take [D.B.] out of state without permission." Given these facts, the State posited that it "[did] not matter that there was not a written order detailing visitation" and the evidence demonstrated defendant's "intent to interfere with DCF's rights."

¶ 13. The court issued a written decision in July 2017 granting defendant's motion for a judgment of acquittal. The court noted that "the jury's verdict was reasonable" based on the instructions given during the trial. But the court explained that it had erred in not instructing the jury that, to prove custodial interference when DCF is the custodian, the State must produce evidence "of a court order . . . . detail[ing] the parent-child contact parameters." The detailed order provides the parent with notice of "when and where they are allowed to have contact with their children." This "bright-line rule," the court explained, separates mere "non-criminal interference with a custodian's wishes" from an "unlawful deprivation of custody" and tracks § 2451's original purpose—limiting parent-on-child kidnapping as a means to circumvent custody arrangements. The court found it dubious that the Legislature intended to impose felonious liability "based only on the word of the assigned social worker, even when there is a court order granting DCF custody." Because the State failed to produce this type of court order during the trial, the court granted defendant's motion for a judgment of acquittal. The State filed this timely appeal.

5

¶ 14. The State's argument on appeal mirrors its argument below: namely, (1) the evidence demonstrated the elements of custodial interference; (2) the trial court erroneously added an element by requiring evidence of a court order specifying parent-child contact; and (3) the social worker provided adequate notice of the visitation guidelines—as evidenced by defendant calling to request permission for the trip to Massachusetts.[6]

¶ 15. Defendant counters with an argument that largely tracks the reasoning in the trial court's decision: (1) by requiring the State to produce an order detailing parent-child contact, "the court was not adding a new element, but finding that without it, the evidence is insufficient to prove the requisite element of intent"; and (2) a parent-child contact order is necessary to distinguish an act that merely prevents DCF as the legal custodian from exercising physical control over the child versus an act that unlawfully deprives custody.

¶ 16. In deciding whether the evidence below was sufficient to convict defendant of custodial interference, "we review the evidence presented by the State viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." State v. Discola, 2018 VT 7, ¶ 18, __ Vt. __, __ A.3d __ (quotation omitted). "We examine both the strength and the quality of the evidence; evidence that gives rise to mere suspicion of guilt or leaves guilt uncertain or dependent upon conjecture is insufficient." Id. (quotation omitted). We review the trial court's legal determinations without deference. State v. Webster, 2017 VT 98, ¶ 8, __ Vt. __, 179 A.3d 149.

¶ 17. Vermont's custodial interference statute creates felony liability for "taking, enticing or keeping a child from the child's lawful custodian, knowingly, without a legal right to do so,

_____

[6] In addition, the State argues that the trial court's decision violates the Equal Protection Clause of the U.S. Constitution because it results in a "a parent whose child is in DCF custody [enjoying] higher protections than a parent whose child is not in DCF custody." As we reverse on other grounds, we do not reach this argument.

when the person is a relative of the child and the child is less than 18 years old." 13 V.S.A. § 2451(a). Broken into its subcomponents, custodial interference entails: (1) an intentional (2) taking, enticing away, keeping, or withholding, that (3) unlawfully deprives the custodian of custody. See, e.g., State v. Wootten, 170 Vt. 485, 491, 756 A.2d 1222, 1226 (2000); State v. Doyen, 165 Vt. 43, 50, 676 A.2d 345, 348 (1996). Although the custodial interference statute was originally "intended to respond to the increasing occurrence of parental abduction of children as a means to settle a custody dispute or to permanently alter custody," State v. Petruccelli, 170 Vt. 51, 59, 743 A.2d 1062, 1068 (1999), we have previously held that DCF qualifies as a "custodian" under the statute if it has court-awarded custody. State v. O'Dell, 2007 VT 34, ¶ 8, 181 Vt. 475, 924 A.2d 87 (explaining that "lawful custodian" for purposes of § 2451 "includes state agencies, such as DCF").

¶ 18. Applying this statutory framework, we reject the trial court's legal conclusion that a defendant can unlawfully deprive DCF of custody under the custodial interference statute only if a court order specifies the schedule and limitations on visitation. Such a requirement is not the only means of putting a defendant on notice of what might constitute a deprivation of DCF's custody, is inconsistent with our past caselaw, and could undermine flexibility in visitation arrangements to the detriment of children in DCF custody and their parents. Moreover, we conclude that the evidence in this case was sufficient to demonstrate that defendant unlawfully deprived DCF of custody.

¶ 19. We disagree with the trial court's conclusion that a court order detailing the conditions for when and how parent-child contact is to occur was necessary to provide defendant with notice of when her actions might violate § 2451. Although such a court order may be one means of proving that a defendant had the necessary notice, it is not the only means by which notice may be proven. This is a case in point. In January 2016, the superior court granted DCF temporary custody of D.B. As the trial court indicated, this custody order did not specify any

7

schedule or parameters for parent-child contact. However, after the court entrusted temporary custody to DCF, DCF (through its social worker) provided clear notice to defendant through multiple conversations that visits needed to be supervised, that there was a specific protocol for D.B.'s medical appointments, and that defendant could not take D.B. out of the state without permission. Defendant demonstrated understanding of the rules laid out in these conversations when she attempted to ask for permission before taking D.B. on the trip to Massachusetts. Even without a court order expressly addressing visitation, the jury had ample evidence to conclude that defendant was on notice that taking D.B. out of the state for several days without permission would interfere with DCF's custodial rights.

¶ 20. Moreover, this Court has already upheld a custodial interference conviction in the absence of an order detailing the parameters of parent-child visitation. In O'Dell, DCF was the custodian through an emergency order and defendant refused to transfer her children to DCF for approximately two hours. 2007 VT 34, ¶¶ 2, 10. We held that:

> [T]he family court, in the interests of the children's welfare, issued an order transferring legal custody of the minor children to DCF. DCF was the "legal custodian" of the children when defendant refused to allow DCF workers to take the children into their protection. Thus, we disagree with defendant that it was legally impossible for her to commit custodial interference, and we affirm her conviction.

Id. ¶ 10.

¶ 21. We reject the argument that this case is different because in O'Dell DCF had custody through an emergency care order under 33 V.S.A. § 5513(b),[7] which usually lasts for only a short duration, whereas here DCF had custody through a temporary order under 33 V.S.A. § 5308, which can last far longer and contemplates parent-child contact. See id. § 5308(e)(2)(A) (explaining that the order may establish parent-child contact). The trial court concluded that in a

---

[7] 33 V.S.A. § 5513(b) was repealed in 2007, effective 2009, and replaced with 33 V.S.A. § 5305.

case like this, where DCF has custody through a temporary order under § 5308, the Legislature could not have intended to impose felony liability based only on a social worker's verbal instruction.

¶ 22.     We disagree. O'Dell supports the general proposition that the Legislature intended for DCF to be included in § 2451 as a "legal custodian."  2007 VT 34, ¶ 10.  Although defendant in this case had the right to visit D.B. under terms set by DCF through its social worker, within the parameters of the court's order, she had no custody rights.  Whether DCF has custody through an emergency order intended to last a short duration, or a temporary order that could last far longer, its custodial rights remain the same, and the effect of any custodial interference on both the child and the custodian remains the same.  See id. ¶ 9 (explaining that "[t]he purpose of the custodial interference statute is to protect any custodian from deprivation of his or her rights" and it "is designed to protect children, who are victims in these cases and suffer detrimental effects from wrongful taking or withholding").  We see no reason to treat DCF's instructions through its social worker as insufficient to establish the limitations on defendant's visitation.

¶ 23.     A ruling to the contrary would constrain DCF's flexibility in many cases to set a visitation schedule that evolves to suit the needs of the child and the capabilities of the parent. Sometimes it may make sense for a court to delineate parent-child contact in the order granting DCF temporary custody, or to establish a minimum floor of visitation subject to increases in DCF's discretion.  But we are reluctant to adopt a rule that would require the family division to establish rigid visitation schedules in every case in which DCF has custody.  Circumstances change.  A parent pursuing reunification may be able to engage in ever more frequent and less constrained visitation.  A trial court can reasonably give DCF the flexibility to, for example, increase parental visits beyond a court-mandated floor without having to come back to court each time for court approval in the form of a written order—especially given the challenges of securing a timely response from the court.  See In re A.S., 2016 VT 76, ¶ 11, 202 Vt. 415, 150 A.3d 197 (per curiam)

(noting "dramatic increase in the juvenile docket and a shortage of resources including judges, lawyers, guardians ad litem . . . and courtroom space").

¶ 24.    Given our legal analysis, we conclude that the State presented sufficient evidence to support the jury's verdict that defendant was guilty of custodial interference. Although we reject the trial court's conclusion that the custodial interference statute only applies in cases in which a court order sets forth a specific visitation schedule, we share the trial court's view that the felony statute is not broadly applicable to all manner of disputes between DCF, through its social workers, and parents of children in DCF custody. When DCF is a child's legal custodian, a custodial interference charge against a child's parent requires more than mere failure to strictly adhere to every limitation set by the DCF social worker, or by the court for that matter. The family division has ample tools within the juvenile docket to manage most instances of parental failure to faithfully meet the court's or DCF's restrictions concerning a parent's engagement with a child in DCF custody. But the lesson of O'Dell is that in some instances a parent's interference with DCF's custodial responsibilities may be sufficiently egregious as to support prosecution for custodial interference.

¶ 25.    In determining when a parent's conduct is sufficiently egregious to support a custodial interference charge in instances where DCF is the temporary custodian, courts should consider the totality of the circumstances. Relevant considerations may include the duration of the interference, the frequency with which the charged parent has interfered with DCF's custodial rights, the reason for the parent's interference, evidence of the parent's intent, and the impact of the interference on the safety and wellbeing of the child. In addition, since we share the trial court's concerns that DCF should not have unlimited authority to set parameters that are enforceable through a custodial interference charge, rather than the ordinary processes available in the child protection docket, courts should also consider the nature of the restriction on contact

10

violated by a parent, including the reason for the restriction and its significance in protecting the child's well-being.

¶ 26.    In this case, the uncontroverted evidence of defendant's conduct meets the criteria for custodial inference under the factors described above.  First, DCF's requirement that defendant limit her visits with D.B. to those supervised visits prescribed by the schedule then in place (or otherwise specifically authorized by DCF), and that defendant not take D.B. out of the state for visits supervised by defendant's mother, reflected an effort by DCF to ensure that it knew when D.B. was with defendant, and to keep D.B. within the jurisdiction.  Second, in violation of these express restrictions, and knowing she did not have permission or legal authority to do so, defendant picked D.B. up outside of her scheduled visitation time; took her out of the state for two nights; failed to take D.B. to her regularly scheduled pre-school; and without good cause failed to return D.B. immediately upon DCF's instruction, so that the DCF social worker had to personally travel to Massachusetts to retrieve the child.  Cf. O'Dell, 2007 VT 34, ¶ 10 (upholding custodial interference conviction where defendant deprived DCF of custody for two hours).  These circumstances collectively support the State's charge in this case given the duration of the incident, defendant's choice to take the child out of the state for overnight visits knowing that she was not supposed to do so, her persistence in continuing the interference even after she was warned, and the potential negative impact on the child.  This was not a minor failure to adhere to the letter of DCF's restrictions.  Defendant did not simply return D.B. late from a scheduled visit or take her to a local playground outside of scheduled visitation hours.  Defendant's behavior here was sufficiently egregious to rise to the level of unlawfully depriving DCF of custody.  See Petruccelli, 170 Vt. at 59, 743 A.2d at 1068 (explaining that custodial interference demands more than "prevent[ing] the legal custodian from exercising physical control over the child" (quotation omitted)).  As the trial court explained in its written decision, absent a requirement of a court order outlining parent-child contact, "the jury's verdict was reasonable."

11

¶ 27.    For these reasons, we reverse the trial court's grant of a judgment of acquittal and remand for an entry of judgment and sentencing.

Reversed and remanded.

FOR THE COURT:

_____
Associate Justice