NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 8

No. 2019-029

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Chavis Murphy | June Term, 2022 |

Alison S. Arms, J. (motion to suppress); Dennis R. Pearson, J. (motion of judgment for acquittal and renewed motion); Martin A. Maley, J. (motion for new trial)

Sarah F. George, Chittenden County State's Attorney, and Andrew M. Gilbertson, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Teachout, Supr. J. (Ret.), Specially Assigned

¶ 1. **CARROLL, J.** Defendant appeals from his conviction for second-degree murder following a jury trial. He argues that the trial court erred by: (1) denying his motion for judgment of acquittal; (2) denying his motion to suppress evidence obtained as a result of a warrantless ping of his cell phone; (3) failing to sua sponte give a limiting instruction on evidence of flight; and (4) denying his motion for new trial. We conclude that defendant was not entitled to a judgment of acquittal. We further hold that, while defendant had a legitimate privacy interest in his real-time cell site location information under Article 11 of the Vermont Constitution, the warrantless

ping was justified by exigent circumstances, and defendant's motion to suppress was therefore properly denied. We reject defendant's remaining arguments as well. We therefore affirm.

¶ 2. The trial court denied defendant's suppression motion in a May 2017 order. It took judicial notice of the findings from its June 2016 hold-without-bail decision and made additional findings. The record thus indicates the following. Around 2:00 a.m. on December 27, 2015, a fatal shooting occurred in Burlington, Vermont, near the intersection of Church and Main Streets. The victim was shot multiple times; three of the shots entered his back. Police arrived on the scene almost immediately after the shooting; they detained and interviewed various individuals.

¶ 3. Several witnesses identified defendant as being present and interacting with the victim immediately before the victim was shot. Police also reviewed surveillance video that captured portions of the scene; it depicted events that generally matched the description provided by the witnesses referenced above. One video showed a group of individuals, who matched the description of witnesses with whom police spoke, walking down Church Street. The group paused in a parking lot, then most moved just out of the camera's range. The video then showed the witnesses visibly reacting to something and running up Church Street. Another video showed an individual wearing clothing that matched defendant's description running down Church Street, away from the scene of the shooting; a witness testified that the shooter had run away in that direction. Several others from the group then ran away in the same direction as this individual. The video shows police arriving thirty seconds later.

¶ 4. Police attempted to locate defendant at his known addresses without success. They learned that defendant had rented a car, and on December 28, 2018, they requested license-plate-reader information throughout Vermont. They also learned from witnesses that defendant matched the description of the alleged shooter, although no witness said that they actually saw defendant shoot a gun. Also on December 28, a friend of defendant's who was present at the shooting told police that he saw the victim approach defendant outside a bar; the victim walked away and then

2

came back. Defendant made a quick movement with his hands and then shots rang out. The friend told police that he thought defendant shot the victim. The friend also described what defendant was wearing that evening, which was consistent with the images on the surveillance video.

¶ 5.  Police considered defendant a good suspect, and on December 28, they asked defendant's cellphone carrier, AT&T, for an emergency exigent ping of defendant's cellphone. A ping can locate a phone by showing what cellphone tower the phone is using to draw a signal— data known as cell site location information (CSLI). The lead detective contacted AT&T's law enforcement compliance center and served a subpoena request. In support of the exigent request, the officer indicated that there had been a bar fight, an active shooter, a victim who was unfamiliar with the suspect, and that the shooter might be unreasonable or "in some sort of mental state" and in possession of a firearm. AT&T complied with the request but initially informed police that defendant's phone was turned off and, as a result, it had no information about the phone's location.

¶ 6.  On December 29, police obtained a photograph showing a vehicle associated with defendant's license plate driving eastbound on Main Street in Burlington five minutes after the shooting. On December 29, just before 5 p.m., police obtained a search warrant for defendant's cellphone records from December 26, 2015, forward. The warrant application sought various items, including subscriber names and addresses, contact lists on the phone and detailed records about dates and times of calls, and GPS data.[1] The search warrant and warrant application, including a supporting affidavit, was admitted into evidence at the suppression hearing.

---

[1]  The trial court noted that in mid-January 2016, the State obtained historical CSLI from AT&T pursuant to this valid warrant, which included detailed historical location information tracking defendant's movements over the course of several days. See Commonwealth v. Almonor, 120 N.E.3d 1183, 1197 (Mass. 2019) (explaining that historical CSLI data is "collected and stored by the service provider in the ordinary course of business when the cell phone user voluntarily makes or receives a telephone call"). Defendant did not challenge this warrant or the information gained therefrom in his motion to suppress.

¶ 7.    Approximately ninety minutes after the warrant issued but before it was served on AT&T, AT&T notified police that defendant's phone had been turned back on and that a subsequent ping had located defendant's phone in West Springfield, Massachusetts.  Vermont police obtained a warrant for defendant's arrest.  They alerted Springfield police that a homicide suspect's cellphone had been pinged as being located within several feet from a motel at a particular address.  A second ping placed the suspect near a particular restaurant on a specific street.  A police officer spotted a person fitting the suspect's description and then received information that a third ping placed the suspect in the area where he was observed.  Defendant was arrested shortly thereafter near a motel where he was staying and charged with first-degree murder.

¶ 8.    When first confronted by police, defendant essentially said, "How did you find me?  Who was it?  I know who."  Defendant had three cellphones at the time of his arrest, two of which were prepaid (in cash) and had just been purchased, and one of which he had placed on top of the wheel, under the wheel well, of the vehicle he was driving.  Police searched defendant's motel room pursuant to a separate search warrant.  They seized personal belongings, including the clothing that defendant was allegedly wearing at the time of the shooting as well as various personal items, such as defendant's birth certificate and social security card, which had been ripped up.

¶ 9.    Defendant moved to suppress evidence gathered after his arrest, including his personal belongings seized in Massachusetts, statements made to police, and the fact that he had left Vermont and was found in Massachusetts.  He argued that, by obtaining his real-time CSLI, police conducted a warrantless search in violation of the Vermont and Federal Constitutions.  The State opposed the motion, arguing that a warrant was unnecessary because defendant had no reasonable expectation of privacy in his real-time CSLI, but, even if he did, the search was justified by exigent circumstances.

4

¶ 10.    Following a hearing, the court denied the motion to suppress.  It concluded that the real-time CSLI data obtained by police pursuant to their warrantless ping request did not constitute private information protected by either the Fourth Amendment of the U.S. Constitution or Article 11 of the Vermont Constitution.  Even if it were protected private information, the court concluded that exigent circumstances justified the request.  The court further found that defendant was arrested on a public street pursuant to an arrest warrant issued on the evening of December 29, 2015, and that his presence on the public street was a fact over which he maintained no reasonable expectation of privacy.[2]

¶ 11.    Following a trial, the jury found defendant guilty of second-degree murder.  The court denied defendant's motion for a judgment of acquittal at trial and his renewed motion for a judgment of acquittal following the jury's verdict.  This appeal followed.

I.  Motion for Judgment of Acquittal

¶ 12.    We begin with defendant's assertion that he was entitled to a judgment of acquittal because a decision in his favor would dispose of this appeal.  Defendant characterizes the State's evidence as "paper thin" and generally asserts that there was not enough evidence to support his conviction.  In support of his argument, defendant references the court's statement at trial that there was "just enough, marginally," to allow the case to go to the jury and he notes that the jury did not convict him of first-degree murder.  He maintains that these two factors, taken together with the court's failure to instruct the jury on flight evidence, created a real danger that he was wrongfully convicted.  According to defendant, this danger was exacerbated because no one saw

_____

[2] The trial court also found that even if defendant's rights were violated by the warrantless ping, suppression was not an available remedy because the lead detective arguably relied in good faith on provisions in the Stored Communications Act authorizing the request.  The State conceded at oral argument that this conclusion was error as Vermont has not recognized a good-faith exception to the exclusionary rule.  See State v. Oakes, 157 Vt. 171, 172, 598 A.2d 119, 120 (1991) (declining to recognize good-faith exception to exclusionary rule for violations of Vermont Constitution).  We thus do not address this portion of the court's decision.

the shooter, the shooting occurred in the early morning hours after the bars had closed, and "memories were foggy at best." He suggests that the jury may have drawn inferences based on implicit bias and that the jury had to speculate to reach its decision.

¶ 13. The trial court denied defendant's motion for judgment of acquittal at the close of the State's case and denied his renewed motion for a judgment of acquittal following the verdict. The court found the evidence sufficient to support the jury's verdict. It recounted the trial evidence in detail, which we do not repeat here. As the court explained, the State's evidence included testimony from two witnesses familiar with defendant. Both testified that they were standing near defendant in the moments before the shooting. Both stated that defendant and the victim passed one another on the sidewalk and that defendant made some motion toward the victim immediately before they heard gunshots. A witness saw defendant with a silver-black gun in his right hand immediately before seeing defendant move toward the victim and hearing gunshots. The victim died of multiple gunshot wounds.

¶ 14. The trial court ultimately concluded that, based on the evidence presented at trial, the jury could find beyond a reasonable doubt that: the gunshots that killed the victim were fired at relatively close range and came from within the immediate vicinity of the group outside on Church Street, which included defendant; defendant was the only person within that group seen holding a handgun; defendant advanced toward the victim, who had turned and was walking away; the victim was killed by multiple gunshots, at least one of which entered from the rear and exited the front of his body; the shooter was standing near the victim's friend, Leon Delima, and next to defendant's friend, Samuel Alexander; the shooter was taller than 5 foot 11 inches, and, other than the victim, defendant was the only person in the group who was that tall (or taller). Taking the evidence in the light most favorable to the State and drawing reasonable inferences, the trial court found that, by objective and rational process of elimination, the jury could conclude beyond a

6

reasonable doubt that defendant was the only person present at the scene who could have been, and thus must have been, the shooter, that is, he was the person who shot and killed the victim.

¶ 15. The court further determined that the jury could find based on this evidence that the shooter—defendant—acted intentionally with the purpose of at least causing the victim grievous bodily harm. There was no evidence of mistake, accident, or immediate provocation. The court deemed the evidence of defendant's "flight," both immediately and in the longer-term, marginally relevant but unnecessary to prove the State's case. It found that the verdict could stand without it. In reaching its conclusion, the court emphasized that the jury, as factfinder, was entitled to determine the weight of the evidence and the credibility of the witnesses.

¶ 16. On review of the court's decision, we apply the same standard as the trial court and consider "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." State v. Delisle, 162 Vt. 293, 307, 648 A.2d 632, 641 (1994) (quotation and alterations omitted). We agree that the jury's verdict is supported by sufficient evidence here.

¶ 17. As defendant recognizes, the State can rely on circumstantial evidence alone to prove its case. See State v. Colby, 140 Vt. 638, 642, 443 A.2d 446, 457 (1982) (recognizing that "guilt of a defendant in a criminal case may be proved by circumstantial evidence alone, if that evidence is otherwise proper"). "When assessing circumstantial evidence, the jury may draw rational inferences to determine whether disputed ultimate facts occurred," and "[t]he State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence." State v. Caballero, 2022 VT 25, ¶ 19, __ Vt. __, 279 A.3d 676 (quotations omitted). "The evidence and inferences, however, must add up to more than mere suspicion; the jury cannot bridge evidentiary gaps with speculation." Id. ¶ 19 (quotation omitted). We leave it to the jury to "sift through the evidence and determine what to believe and what not to believe." State v.

7

Chenette, 151 Vt. 237, 241, 560 A.2d 365, 369 (1989) (citing State v. Daigle, 136 Vt. 178, 180, 385 A.2d 1115, 1116 (1978) (explaining that jury must determine if evidence is believable and, if so, what weight it should be accorded)).

¶ 18.   None of defendant's arguments establish that he was entitled to a judgment of acquittal.  The court's description of the evidence as sufficient, albeit "marginally," to support a first-degree murder conviction does not support defendant's position that there was insufficient evidence to support his conviction of second-degree murder.  The trial court found the evidence sufficient to allow the jury to consider if defendant was guilty of first-degree murder and sufficient to support defendant's conviction for second-degree murder.  In any event, we apply the same standard as the trial court on review and reach our own conclusion as to the sufficiency of the evidence.

¶ 19.   The fact that the jury did not convict defendant of first-degree murder similarly does not show that there was insufficient evidence to support defendant's second-degree murder conviction.  Defendant's remaining arguments—that the shooting occurred in the early morning hours after the bars closed and that "memories were foggy"—concern the weight of the evidence and the credibility of witnesses, matters reserved exclusively for the jury, and these arguments are unavailing given our standard of review.  Defendant's final assertion regarding implicit bias does not appear to have been raised below.  Even if it had been, it is speculative and it does not undermine the actual evidence recounted above that supports the jury's verdict.  We agree with the trial court that the evidence, while circumstantial, supports the jury's verdict, and, like the trial court, we agree that the verdict stands without consideration of flight evidence.  Defendant fails to show that the court erred in denying his motion for judgment of acquittal.

## II.  Limiting Instruction on Flight Evidence

¶ 20.   Defendant next asserts that the court committed plain error by failing to sua sponte provide a limiting instruction regarding flight evidence.  Defendant maintains that a limiting

8

instruction was required because "the State's case came down to two witnesses who both changed their testimony, some grainy video footage, and a repeated hammering that [defendant] was arrested while he was on the run." He characterizes the omission of a limiting instruction as obvious error because this Court has held that evidence of flight is insufficient, standing alone, to sustain a conviction. According to defendant, the flight evidence was the "tentpole" of the State's case and thus there is a reasonable probability that the error affected the outcome.

¶ 21. As we have often repeated, "we find plain error only in rare and extraordinary circumstances." State v. Ray, 2019 VT 51, ¶ 6, 210 Vt. 496, 216 A.3d 1274 (quotation omitted). A party must show that: "(1) there was error, (2) the error is obvious, (3) the error affects the substantial rights of and results in prejudice to the defendant, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted). Defendant fails to make the necessary showing here.

¶ 22. As an initial matter, we have recognized that flight evidence may properly be admitted and relied upon by a jury "as circumstantial evidence of guilt," State v. Welch, 2020 VT 74, ¶ 9, 213 Vt. 114, 249 A.3d 319, even if its admission can be "problematic" and dependent on a series of inferential steps, State v. Perrillo, 162 Vt. 566, 569, 649 A.2d 1031, 1033 (1994). While "flight evidence is not sufficient by itself to return a guilty verdict," Welch, 2020 VT 74, ¶ 16, the verdict here did not rest solely on flight evidence, nor was it the "tentpole" of the State's case, as defendant asserts. To the contrary, both the trial court and this Court have found that the jury's verdict was sustainable without consideration of such evidence. We recited above the evidence that supports the jury's verdict and do not repeat it here.

¶ 23. We have also rejected the argument that a trial court commits plain error as a matter of law if it fails to provide a limiting instruction regarding flight evidence. See State v. Stephens, 2020 VT 87, ¶ 37, 213 Vt. 253, 250 A.3d 601. The Stephens Court clarified the holding of Welch, 2020 VT 74, which involved a limiting instruction on flight evidence. In Welch, the defendant

9

argued on appeal that the court committed plain error by failing to instruct the jury that it "could not return a guilty verdict based solely on the evidence of flight." Welch, 2020 VT 74, ¶ 7. We rejected the argument that the failure to include this statement was an "obvious" or plain error. Id. ¶ 15. We considered the instruction the court had provided as sufficient and within its discretion, although we stated that it would be "[b]est practice" to include certain specified language in future instructions. Id. ¶ 16. The Welch Court further found that the jury instructions, read as a whole, did not undermine confidence in the verdict and that "there was ample other evidence supporting the jury's verdict," which undermined the notion that "any error in the flight instruction had an unfair prejudicial impact on the jury's deliberations." Id. ¶¶ 17-18.

¶ 24. In Stephens, 2020 VT 87, flight evidence was admitted, and no limiting instruction was requested or provided. Citing Welch, the defendant claimed plain error on appeal given the court's failure to sua sponte provide a limiting instruction. We clarified that Welch did not stand for the proposition "that a trial court's failure to provide a limiting instruction when admitting evidence of flight as consciousness of guilt, absent any request for such an instruction, constitutes plain error as a matter of law requiring reversal of the underlying conviction." Id. ¶ 37. As in Welch, we found no plain error. Id. ¶ 36. We held "the court's failure to give an unrequested limiting instruction [did] not warrant reversal of defendant's conviction" because, like in Welch, the complainant's testimony provided "ample evidence" in support of the charged crime and the defendant failed to show "that the omission of a limiting instruction . . . raise[d] doubts about the fairness of the criminal proceeding or undermine[d] confidence in the jury's verdict." Id. ¶ 37. We reach the same conclusion here.

¶ 25. Defendant fails to distinguish Stephens. He contends that, unlike Stephens, the flight evidence "was nearly the State's entire case" and that the State lacked "ample" evidence to support the charge. We have rejected that argument above. As previously discussed, the State presented sufficient evidence from various witnesses—putting aside any evidence of flight—to

support the jury's verdict. Defendant fails to show, under the circumstances presented here, that "the omission of a limiting instruction . . . raises doubts about the fairness of the criminal proceeding or undermines confidence in the jury's verdict." Id.

¶ 26. This case is not like State v. Rounds, 2011 VT 39, ¶ 22, 189 Vt. 447, 22 A.3d 477 cited by defendant. In Rounds, we found plain error in a home-improvement-fraud case where the court gave a permissive-inference instruction that was not supported by the evidence and it also "misstated the law and in so doing permitted the jury to infer an element of the crime based on a lower standard than the statute demands." Id. ¶ 22. Defendant contends that the court similarly "misstated the law" here by failing to give a limiting instruction and thereby committed plain error. We have rejected the argument, however, that the mere failure to provide a limiting instruction constitutes plain error as a matter of law. Defendant's plain-error claim is without merit.

### III. Motion to Suppress

¶ 27. We thus turn to the heart of this appeal: whether defendant had a legitimate privacy interest in his real-time CSLI and whether police violated his constitutional rights by pinging his cellphone without a warrant. The trial court's findings will stand unless clearly erroneous; we review the court's legal conclusions de novo. State v. Williams, 2007 VT 85, ¶ 2, 182 Vt. 578, 933 A.2d 239 (mem.).

### A. Privacy Interest

¶ 28. Neither the U.S. Supreme Court nor this Court has yet addressed whether individuals have a legitimate privacy interest in their real-time CSLI.[3] We decide this case under Chapter I, Article 11 of the Vermont Constitution, which is "similar in purpose and effect to the

---

[3] The U.S. Supreme Court has decided that individuals have a legitimate expectation of privacy, for Fourth Amendment purposes, in the record of their physical movements as captured in historical CSLI and that the acquisition of that information by police constitutes a search. Carpenter v. United States, 138 S. Ct. 2206, 2220-21 (2018). The Court made clear, however, that its decision was a narrow one and it was not expressing any view on "real-time CSLI." Id. at 2220.

Fourth Amendment to the United States Constitution," but "provides freestanding protection that in many circumstances exceeds the protection available from its federal counterpart." State v. Martin, 2008 VT 53, ¶ 9, 184 Vt. 23, 955 A.2d 1144 (quotations omitted); see also State v. Simmons, 2011 VT 69, ¶ 16, 190 Vt. 141, 27 A.3d 1065 (recognizing that Vermont Constitution "can afford greater protection against warrantless searches than is sometimes accorded by the Fourth Amendment").

¶ 29.    Article 11 provides that "the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure." Vt. Const. ch. I, art. 11.  The "core value" that Article 11 protects is "freedom from unreasonable government intrusions into legitimate expectations of privacy." State v. Kirchoff, 156 Vt. 1, 6, 587 A.2d 988, 992 (1991) (quotation and alteration omitted); see also Carpenter, 138 S. Ct. at 2213 (recognizing in similar vein that "basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials" (quotation omitted)).  "That value finds its purest expression in the warrant requirement." State v. Geraw, 173 Vt. 350, 357, 795 A.2d 1219, 1225 (2002); see also Carpenter, 138 S. Ct. at 2213 ("When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search [under the Fourth Amendment] and requires a warrant supported by probable cause." (quotation omitted)).  "Absent exigent circumstances . . . , Article 11 prohibits a warrantless search of only those areas or activities that a reasonable person would conclude are intended to be private." Simmons, 2011 VT 69, ¶ 14 (quotation omitted).

¶ 30.    "Under Article 11, the question of whether an individual has a legitimate expectation of privacy hinges on the essence of underlying constitutional values—including respect for both private, subjective expectations and public norms." Id. ¶ 15 (quotation omitted) (emphasis omitted).  "In order to invoke Article 11 protection, a person must exhibit an actual

12

(subjective) expectation of privacy . . . that society is prepared to recognize as reasonable." Id. (quotation and brackets omitted).

¶ 31.  We agree with other courts that have considered similar questions under their state constitutions or the Federal Constitution.  We hold that individuals have a reasonable expectation of privacy in their real-time CSLI and that the acquisition of this information by police is a search that requires a warrant unless an exception to the warrant requirement applies.

¶ 32.  In reaching our conclusion, we find the Massachusetts Supreme Judicial Court's decision in Commonwealth v. Almonor, 120 N.E.3d 1183 instructive.  The Almonor court held as a matter of first impression that a warrantless request by police to ping a cellphone constituted a "search" within the meaning of the Massachusetts Constitution.  See Mass. Const. pt. 1, art. XIV (providing in part that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions"); Almonor, 120 N.E.3d at 1190 (holding that "[a] search in the constitutional sense occurs when the government's conduct intrudes on a person's reasonable expectation of privacy" (quotation omitted)).  The court distinguished between real-time CSLI and historical "telephone call" CSLI where "CSLI is collected and stored by the service provider in the ordinary course of business when the cell phone user voluntarily makes or receives a telephone call."  Id. at 1197.  To obtain real-time CSLI, the court explained, police must "actively induce [the phone] to divulge its identifying information for their own investigatory purposes."  Id. at 1193 (quotation omitted).  The court emphasized the "intrusive nature" of such action and "confidently conclude[d] that such police action implicates reasonable expectations of privacy."  Id.

¶ 33.  Like the U.S. Supreme Court in Carpenter, the Almonor court recognized that cellphones have "become indispensable to participation in modern society."  Id. at 1194 (quotation omitted).  It did not follow, however, that the decision to purchase a cellphone "authorize[d] police to independently, and without judicial oversight, invade or manipulate the device to compel it to

13

reveal information about its user[,] [n]or [did] it operate to reduce one's expectation of privacy against such action." Id. at 1194.

¶ 34.    "In today's digital age," the court explained, "the real-time location of an individual's cell phone is a proxy for the real-time location of the individual." Id. Cellphones thus have the capacity to operate as "a hidden tracking device," providing " 'near perfect surveillance' of its user" via real-time CSLI data and "grant[ing] police unfettered access 'to a category of information otherwise unknowable.' " Id. at 1194-95 (quoting Carpenter, 138 S. Ct. at 2218). "[S]ociety's expectation has been that law enforcement could not secretly and instantly identify a person's real-time physical location at will," and the court concluded that a warrantless ping "contravenes that expectation." Id. at 1195. While "society may have reasonably come to expect that the voluntary use of cell phones—such as when making a phone call—discloses cell phones' location information to service providers . . . and that records of such calls may be maintained," society would not anticipate "that the police could, or would, transform a cell phone into a real-time tracking device without judicial oversight." Id. (citation omitted). The court deemed "[t]he power of such unauthorized surveillance . . . far too permeating and too susceptible to being exercised arbitrarily by law enforcement—precisely the type of governmental conduct against which the framers sought to guard." Id. (quotation omitted). It thus held that a ping is a "search" under the state constitution. Id. at 1181.

¶ 35.    Other courts have identified similar concerns and reached similar conclusions. See, e.g., Tracey v. State, 152 So. 3d 504 (Fla. 2014); Commonwealth v. Reed, 647 S.W.3d 237 (Ky. 2022); State v. Muhammad, 451 P.3d 1060, 1068 (Wash. 2019) (en banc). In Tracey, for example, the Florida Supreme Court held that individuals have "a subjective expectation of privacy of location as signaled by one's cell phone," which society was prepared to recognize "as objectively reasonable" under the Fourth Amendment. 152 So.3d at 526; see also id. at 511 (emphasizing "right of personal security against arbitrary intrusions by official power" under Fourth

14

Amendment). The court found that "the ease with which the government, armed with current and ever-expanding technology, can now monitor and track our cell phones, and thus ourselves, with minimal expenditure of funds and manpower, is just the type of gradual and silent encroachment into the very details of our lives that we as a society must be vigilant to prevent." Id. at 522 (quotation marks omitted). The court rejected the notion that an individual's awareness that a "cell phone gives off signals that enable the service provider to detect its location for call routing purposes" or "which enable [certain] cell phone applications to operate" meant that the user was also "consenting to use of that location information by third parties for any other unrelated purposes." Id. The court deemed it unreasonable to "[r]equir[e] a cell phone user to turn off the cell phone just to assure privacy from governmental intrusion that c[ould] reveal a detailed and intimate picture of the user's life." Id. at 523.

¶ 36.    The Reed court similarly held that police engaged in a warrantless, unreasonable search under both the Kentucky and the federal Constitutions when they obtained real-time CSLI via a ping of a defendant's cellphone. 647 S.W.3d at 241. The court emphasized that police had to take affirmative action to obtain real-time CSLI and this data "c[ould] be used to determine a cell phone's location with near perfect accuracy at any time the phone is powered on." Id. at 246. It found "this usurpation of an individual's private property profoundly invasive," and akin "to a technological trespass." Id. at 247. The court considered this "appropriation of an individual's cell phone . . . precisely the sort of invasion that . . . the average citizen [was] unwilling to accept." Id.

¶ 37.    We find the reasoning of these cases persuasive and reach the same conclusion under Article 11 of the Vermont Constitution. As recognized in the cases above, cellphone providers do not routinely collect the information that the police sought here. To obtain real-time CSLI, police must "actively induce [the phone] to divulge its identifying information for their own investigatory purposes." Almonor, 120 N.E.3d at 1193; see also Reed, 647 S.W.3d at 246 ("Real-

15

time CSLI is not a passive location record but data generated by an affirmative action—a 'ping'—taken by the cell-service provider at the behest of a law enforcement officer."). A ping is part of an investigatory search, and "[m]anipulating our phones for the purpose of identifying and tracking our personal location" is particularly intrusive. Almonor, 120 N.E.3d at 1194.

¶ 38.    We agree that individuals do not reasonably expect that by using their phone, they will be sharing their real-time location information with police. They do not expect their cellphone to act as "a hidden tracking device that can be activated by law enforcement at any moment, subject only to the constraints of whether law enforcement knows the phone number and whether the cellphone is turned on." Id. The fact that police can now, through real-time CSLI, obtain "near perfect surveillance of its user" and "access to a category of information otherwise unknowable," Almonor, 120 N.E.3d at 1194-95 (quotations omitted), does not mean they should be allowed to do so without judicial oversight. We must guard against allowing technological advances to result in fewer privacy rights. See id. at 1194-95, 1196 (recognizing that "[t]his extraordinarily powerful surveillance tool finds no analog in the traditional surveillance methods of law enforcement" and holding that "[t]o allow such conduct without judicial oversight would undoubtedly shrink the realm of guaranteed privacy . . . and leave legitimate privacy rights at the mercy of advancing technology" (quotation omitted)); Commonwealth v. Johnson, 119 N.E.3d 669, 677 (Mass. 2019) (similarly recognizing that "privacy rights cannot be left at the mercy of advancing technology but rather must be preserved and protected as new technologies are adopted and applied by law enforcement" (quotation omitted)); see also Tracey, 152 So. 3d at 512 (recognizing that "technology has advanced to the point that our whereabouts can be ascertained easily and at low cost by the government," which makes the "protections of the Fourth Amendment . . . more, not less, important" (quotation omitted)).

¶ 39.    As other courts recognize, moreover, determining someone's real-time location implicates a distinct privacy interest. Allowing police to obtain this information without any

16

judicial oversight "would empower government agents to invade individuals' most private and closely-held constitutionally protected activities," including, for example, "surveil[ling] in real time when, and precisely where, individuals were in the confines of their private homes, at a place of worship, engaging in political activities, or exercising their right to free speech." Reed, 647 S.W.3d at 250. "Such an invasion is precisely the sort that we find the average citizen unwilling to accept." Id.

¶ 40.    We further agree with the Almonor court that CSLI data is a powerful tool that is "too susceptible to being exercised arbitrarily by law enforcement." Almonor, 120 N.E.3d at 1195. It could be used, for example, every time a crime was committed to determine if any repeat offenders were in the vicinity. This runs counter to the core value served by Article 11 and the purpose of the warrant requirement.

¶ 41.    We hold that that "individuals have a reasonable expectation of privacy in their cell phone's cell-site location information and, thus, that information is entitled to constitutional protection" under Article 11. Reed, 647 S.W.3d at 250. A ping is a search that requires a warrant and "[a]bsent an exception to the warrant requirement, . . . law enforcement must obtain a warrant before acquiring a person's cell-site location information." Id.

B. Exigent Circumstances

¶ 42.    We next consider if an exception to the warrant requirement applies. The trial court found the search justified by exigent circumstances. It recognized that "[t]he test to determine exigent circumstances is an objective one that turns on . . . the totality of circumstances confronting law enforcement agents in the particular case." United States v. Caraballo, 963 F. Supp. 2d 341, 363 (D. Vt. 2013) (quotation omitted); see also State v. Petruccelli, 170 Vt. 51, 61, 743 A.2d 1062, 1069-70 (1999) ("We consider the totality of the circumstances when determining whether exigent circumstances are present sufficient to justify a warrantless entry into the home."). "The question is whether the facts, as they appeared at [the time], would lead a reasonable,

experienced officer, to believe that there was an urgent need to . . . take action." Caraballo, 963 F. Supp. 2d at 363-64 (quotation omitted).

¶ 43. In considering if exigent circumstances exist, the court appropriately looked for guidance to the nonexclusive factors identified in Dorman v. United States, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc). See Petruccelli, 170 Vt. at 61, 743 A.2d at 1070 (looking to Dorman factors in case that, like Dorman, involved warrantless entry into defendant's home). As the Dorman court explained, "[t]erms like 'exigent circumstances' or 'urgent need' are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant, and that it is only in the light of those circumstances and that need that the warrantless search meets the ultimate test of avoiding condemnation under the Fourth Amendment as 'unreasonable.' " 435 F.2d at 392. The Dorman court was mindful that "the numerous and varied street fact situations d[id] not permit a comprehensive catalog of the cases covered by these terms," but it nonetheless found it "useful to refer to a number of considerations that are material" in considering if exigent circumstances exist, noting that the factors it identified "ha[d] particular pertinence" to the facts of the warrantless-entry case before it. Id.

¶ 44. As relevant here, the Dorman factors include that: (1) "a grave offense is involved, particularly one that is a crime of violence"; (2) "the suspect is reasonably believed to be armed" given that the "[d]elay in arrest of an armed felon may well increase danger to the community meanwhile, or to the officers at time of arrest"; (3) "there exists . . . a clear showing of probable cause, including reasonably trustworthy information, to believe that the suspect committed the crime involved"; and/or (4) there is "a likelihood that the suspect will escape if not swiftly apprehended." Id. at 392-93. The timing of the warrantless search may also be a relevant consideration in a totality-of-the-circumstances analysis. See id. at 393 (considering "time of entry—whether it is made at night" as "[a]nother factor to be taken into account, though it works

18

in more than one direction"). The <u>Dorman</u> "factors are merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." <u>U.S. v. Gordils</u>, 982 F.2d 64, 69 (2d Cir. 1992) (quotation omitted). The existence of exigent circumstances sufficient to justify a warrantless ping of a suspect's phone must be determined by consideration of the totality of the circumstances. See <u>Petruccelli</u>, 170 Vt. at 61-62, 743 A.2d at 1070 (recognizing that <u>Dorman</u> "factors are not exclusive" and "there may be circumstances in which the presence of one factor alone can justify a warrantless entry" (quotation omitted)). The ultimate question is one of reasonableness. <u>Dorman</u>, 435 F.2d at 389.

¶ 45. Other state courts have identified similar factors in evaluating exigent circumstances in CSLI-related cases. See <u>Almonor</u>, 120 N.E.3d at 1198 (considering if "police had reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances because the delay in doing so would pose a significant risk that (1) the suspect may flee, (2) evidence may be destroyed, or (3) the safety of the police or others may be endangered" (quotation and brackets omitted)); <u>Reed</u>, 647 S.W.3d at 251 ("The exigent-circumstances exception to the warrant requirement is applicable in situations when, considering the totality of the circumstances, an officer reasonably finds that swift action is required to either prevent imminent danger to life or serious damage to property or to prevent the imminent destruction of evidence."); <u>Muhammad</u>, 451 P.3d at 1074 (recognizing that "warrant requirements must yield when exigent circumstances demand that police act immediately" and that "[e]xigency exists when obtaining a warrant is impractical because delay inherent in securing a warrant would compromise officer safety, facilitate escape, or permit destruction of evidence," including "hot pursuit, fleeing suspect, danger to arresting officer or the public, mobility of a vehicle to be searched, and mobility or destruction of evidence" (citations omitted)); see also <u>Caraballo</u>, 963 F. Supp. 2d at 364 ("[T]he need to obtain and preserve critical evidence in the investigation of a serious crime constitutes exigent circumstances." (quotation marks omitted)).

¶ 46. The trial court found an exigency here based on the nature of the crime, e.g., a grave offense and a crime of violence where the victim was unfamiliar with the shooter. It found that police were concerned, given the seemingly random nature of the crime, that defendant could be unreasonable or suffering from some mental health condition that made him dangerous to the public. The court found that police reasonably believed the suspect was armed and was an "active shooter." Police considered defendant a "good alleged suspect" given witnesses placing him at the scene of the crime, one witness identifying a 6 foot 5 inch shooter (defendant was described as 6 foot 6), and video surveillance footage from the area showing a person wearing clothes that a witness had identified defendant as wearing at the time, running down Church Street away from the shooting.

¶ 47. While there was no testimony at the suppression hearing that the police believed they had probable cause to arrest defendant at the time of the ping request, a judge had found probable cause for historical cellphone data the day after the ping request, before police received any information from defendant's cellphone provider. The court found that police had reasonable information to believe that the phone pinged belonged to defendant and, as a result, had strong reasons to believe that defendant would be located near the phone. There was also evidence that the shooter, described as matching defendant's description, fled the scene; defendant could not be located at his known addresses in Burlington; and he was driving a rental car. The court concluded that, considered objectively, police were reasonably concerned that defendant fled the area and that he was likely to escape if not swiftly apprehended.

¶ 48. The court further found the ping to be an extremely peaceful and nonintrusive means of performing a search. See Dorman, 435 F.2d at 394 (identifying as factor relevant to exigency analysis in home-entry case whether "the entry was made peacefully"). Additionally, it found that the warrant requirement would have been impractical in this instance, noting that it took AT&T over two weeks to provide its response to the warrant for historical CSLI and other data.

20

Thus, under the totality of the circumstances, the court found the warrantless ping justified by exigent circumstances.

¶ 49.    Defendant challenges this conclusion on appeal.  He argues that because the lead detective testified at the suppression hearing that he had enough evidence to apply for a warrant on December 29, it necessarily follows that the police lacked sufficient evidence for a warrant on December 28, the day of the ping request.  Defendant also asserts that, at the time of the ping request, police did not have a witness who placed him at the scene of the crime with a gun.  He further contends that there was no longer any risk to the police officers because "the scene was cleared" and the police could have applied for a warrant if they were concerned about the destruction of evidence.  Defendant contrasts the facts here with those found in Petrucelli, where we found a warrantless entry justified by exigent circumstances in an armed-hostage situation. 170 Vt. at 53, 743 A.2d at 1064.

¶ 50.    We review the court's legal conclusion de novo.  See Williams, 2007 VT 85, ¶ 2; see also Caraballo, 831 F.3d at 101 ("[T]he ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a question of law reviewed de novo." (quotation omitted)).    Considering the totality of the circumstances, we conclude that the warrantless search was justified by exigent circumstances here.

¶ 51.    "Like the Fourth Amendment, Article 11 does not contemplate an absolute prohibition on warrantless searches or seizures, but circumstances under which warrantless searches or seizures are permitted must be jealously and carefully drawn."  Martin, 2008 VT 53, ¶ 9 (quotation omitted).    "We do not lightly depart from the warrant and probable-cause requirements . . . ."  Id.  As we have explained:

> Whatever the evolving federal standard, when interpreting Article Eleven, this Court will abandon the warrant and probable-cause requirements, which constitute the standard of reasonableness for a government search that the Framers established, only in those exceptional circumstances in which special needs, beyond the

21

> normal need for law enforcement, make the warrant and probable-cause requirement impracticable.

Id. (quotation omitted); see also State v. Bauder, 2007 VT 16, ¶ 14, 181 Vt. 392, 924 A.2d 38 (recognizing that "[s]earches outside the normal judicial process are . . . presumptively unconstitutional, and permissible only pursuant to a few narrowly drawn and well-delineated exceptions" and "[s]uch rare exceptions are allowed only in those extraordinary circumstances which make the warrant and probable-cause requirement impracticable" (quotation omitted)).

¶ 52. The totality of the circumstances here meets this high bar. Obviously, each case must be judged on its own facts, and this case need not mirror the facts of Petrucelli to establish exigent circumstances. Looking to the Dorman factors as a guide, the case involves "a grave offense" and "one that is a crime of violence." 435 F.2d at 392 (recognizing that "the restrictive requirement for a warrant is more likely to be retained, and the need for proceeding without a warrant found lacking, when the offense is what has been sometimes referred to as one of the 'complacent' crimes, like gambling"). Police "reasonably believed [defendant] to be armed." Id. (recognizing that "[d]elay in arrest of an armed felon may well increase danger to the community meanwhile, or to the officers at time of arrest"). A judge found probable cause to believe that defendant "committed the crime involved" prior to any receipt of the CSLI information; and there was "a likelihood" that defendant would "escape if not swiftly apprehended." Id. at 393. Police requested the ping on the day after the murder after, among other things, searching unsuccessfully for defendant at his known locations and interviewing an eyewitness who identified defendant as having probably shot the victim. As in Dorman, "police were still dealing with a relatively recent crime, and prompt arrest might locate and recover the instrumentalities . . . of the crime before otherwise disposed of," "[a]nd the delay was not of their own making." Id. Police "engaged steadily and systematically in the identification and pursuit of the criminal suspect[]." Id. at 394. However, unlike the trial court, we are not persuaded that the length of time that it took for AT&T

22

to produce historical CSLI data bears on whether it would be impractical to obtain a warrant for real-time CSLI a ping. In this case, police had obtained a warrant by the time that they received a response to their warrantless ping request.

¶ 53. Contrary to defendant's assertion, moreover, police did have information that placed defendant at the scene with a gun.[4] The record shows that at the time of the ping request, various witnesses told police that defendant was present at the scene of the shooting. A witness, who was a friend of defendant, stated that defendant exchanged words with the victim. Defendant made a quick movement with his hands and multiple gunshots followed. This witness told police that he thought defendant shot the victim. It was reasonable for police to infer that defendant possessed a gun at the scene.

¶ 54. A witness also described the clothing defendant was wearing that evening. Police reviewed surveillance video that was consistent with the description provided by witnesses, including a person matching defendant's description running from the scene of the shooting. Police located and interviewed the other individuals present at the scene who were also depicted on surveillance video; they could not locate defendant, including at his known addresses. Police could reasonably presume from these facts that defendant had shot the victim, he was armed, and he had fled. It was reasonable to presume that he might destroy evidence related to a such a serious crime, such as the gun or bloody clothing. Cf. Caraballo, 963 F. Supp. 2d at 364 ("Courts, including the Supreme Court, have recognized that the need to obtain and preserve critical evidence in the investigation of a serious crime constitutes 'exigent circumstances' which renders the failure to obtain a warrant reasonable under the Fourth Amendment." (citing cases)).

---

[4] Defendant correctly notes that while a witness testified at the bail hearing that he saw defendant with a silver-black gun, police did not possess that information at the time of the ping request. We do not rely on that testimony here.

23

¶ 55.   We are unpersuaded that the risk to police and the public was nonexistent because the scene of the shooting had been cleared.  Police reasonably believed defendant to be armed; he shot an apparently random victim; and he had apparently fled.  It was reasonable to assume from these circumstances that he posed a risk to police and to the public.  See Almonor, 120 N.E.3d at 1199 (concluding similarly that where suspect murdered individual in presence of others who knew him, unprovoked and with no apparent motive and no apparent fear of consequences, it was reasonable to believe that "other individuals were in danger as well").  It does not necessary follow, moreover, that police lacked probable cause to believe defendant committed the crime on the day of the ping simply because an officer testified that there was probable cause the following day.  In any event, a judge found probable cause by the time that police received any information from the ping request, which we find compelling in evaluating the totality of the circumstances here.

¶ 56.   Other courts have similarly found warrantless ping requests justified by exigent circumstances in cases involving violent and grave offenses.  See Almonor, 120 N.E.3d at 1197 (finding warrantless ping justified by exigent circumstances in murder case); Muhammad, 451 P.3d at 1075 (finding warrantless ping justified by exigent circumstances in rape and felony murder case where facts demonstrated that defendant "was in flight, that he might have been in the process of destroying evidence, that the evidence sought was in a mobile vehicle, and that the suspected crimes (murder and rape) were grave and violent charges").

¶ 57.   The court's decision in Almonor is particularly compelling.  In that case, an individual was murdered with a sawed-off shotgun.  The murder occurred in the presence of witnesses who knew the defendant.  Police requested a ping of the defendant's cellphone after the shooting, describing the exigency as: "outstanding murder suspect, shot and killed victim with shotgun.  Suspect still has shotgun."  Almonor, 120 N.E.3d at 1189 (quotation marks omitted).  Police then used the CSLI information in connection with other evidence to locate and arrest the defendant.

24

¶ 58. The defendant there conceded that police had probable cause to believe that he committed the crime but argued that they should have obtained a warrant for his CSLI data. Looking at "the totality of the circumstances," the court found the search justified by exigent circumstances. Id. at 1197. The court found "reasonable grounds to believe that the defendant would have been aware that police would be looking for him" given that "[h]e had shot the victim in the daytime in the presence of others" and "there were at least two witnesses who could identify him." Id. at 1198. The defendant had fled, moreover, creating "a risk that, with the passage of time, he would take further precautions to effectuate his escape." Id. The defendant had also used a sawed-off shotgun—an illegal and dangerous weapon—and police had "reasonable grounds to believe" the defendant might "attempt to conceal or destroy the shotgun before he was located by police." Id. at 1198. The court further found it reasonable to believe that the defendant's continued possession of this weapon "posed an immediate risk to the safety of police and others," particularly given that "the suspect not only had shot and killed once with the shotgun, but that he had brutally murdered a person without an apparent motive." Id. at 1199. "[I]f the suspect shot one person, when unprovoked and seemingly undeterred by fear of discovery or reprisal," the court explained, it was reasonable to believe that "other individuals were in danger as well." Id.

¶ 59. For all these reasons, the court concluded that, at the time of the ping, "police had reasonable grounds to believe that obtaining a warrant would be impracticable because taking the time to do so would have posed a significant risk that the suspect m[ight] flee, evidence m[ight] be destroyed, or the safety of the police or others m[ight] be endangered." Id. (citing Carpenter, 138 S. Ct. at 2223 (noting that certain "exigencies" may permit police to access cellphone location information without warrant, such as need to "pursue a fleeing suspect, protect individuals from imminent harm, or prevent the imminent destruction of evidence")) (other citation omitted).

¶ 60. These factors are present in the instant case as well. The shooting occurred in the presence of others, and defendant was identified as the shooter by a person familiar with him.

25

Defendant knew that there were witnesses who could identify him. While police located the others who had been in the group at the time of the shooting, they could not find defendant at any of his known addresses. A person matching his description was seen fleeing from the scene. It was reasonable to presume that defendant had fled and that he would take additional steps to perfect his escape. Defendant was described as calm just prior to shooting the victim, and the victim was a stranger. As in Almonor, he was alleged to have shot someone "when unprovoked and seemingly undeterred by fear of discovery or reprisal," and "it was reasonable to believe" that, given this behavior, others "were in danger as well." Id.

¶ 61. This case can be contrasted with Reed, where the court found no exigent circumstances in an armed robbery case. 647 S.W.3d at 251. In Reed, the defendant allegedly called an acquaintance and asked to meet at a gas station. When the friend arrived, the defendant allegedly threatened him at gunpoint and stole his money. The defendant then drove away. The friend called police and provided them with the defendant's cellphone number. The officer pinged the defendant's cellphone and located his vehicle. Police continued to ping the phone for the next ninety minutes, obtaining real-time CSLI continually during that period. Police waited until the vehicle returned toward the area of the gas station, stopped the car, and arrested the defendant.

¶ 62. In finding an absence of exigent circumstances, the court emphasized that the defendant did not "present[] an imminent danger to the life of another" and there had been no reference to "a need to preserve any evidence in [the defendant's] possession." Reed, 647 S.W.3d at 251. It added that the defendant "was not alleged to have committed a string of robberies, nor did he provide information to [the alleged victim] that he intended to commit another robbery after departing from the gas station." Id. The court further found that the police were not in "hot pursuit" of the defendant. Id. The court reasoned that if it were to find the pinging justified by exigent circumstances, that rationale "could be applied to any case in which a suspect is accused

26

of criminal conduct and the police seek to capture that suspect." Id. The court "refuse[d] to so expand the scope of this exception to the warrant requirement." Id. at 251-52.

¶ 63. As described above, we are faced with much different circumstances in the instant case, including a much more grave and violent offense and an ongoing danger posed to the police and the public by a fleeing, armed, suspect accused of murdering a stranger on the street, and a finding by a judge of probable cause at the time that police received information regarding the warrantless ping. Thus, for the reasons set forth above, we conclude that the totality of the circumstances in this case shows that exigent circumstances justified the warrantless ping. We therefore affirm the trial court's denial of defendant's motion to suppress.

## IV. Motion for New Trial

¶ 64. Finally, we consider defendant's assertion that the court erred in denying his motion for a new trial. As relevant here, defendant argued below that, following his trial and conviction, he located two witnesses who saw the shooting. Defendant asserted that these two men knew him, saw the shots that killed the victim, and said that the shots were fired by a tall, thin man who they did not know. Defendant submitted two sworn affidavits from these individuals in support of his motion.

¶ 65. Following a two-day hearing during which these and other witnesses testified, the trial court denied the motion. It concluded that defendant failed to establish any of the elements necessary to show that he was entitled to a new trial. It made numerous findings, including the following. The two new witnesses indicated that, on the night in question, they saw defendant at bar on Church Street; a fight later broke out at the bar. At approximately 2:00 a.m., when the bars were closing, the witnesses were standing on the sidewalk on the lower end of Church Street. One of the witnesses had previously told police, however, that he was not on the sidewalk at that time.

¶ 66. Neither man testified that he saw the shooting, despite assertions to this effect by the defense. One of the witnesses said that he heard gun shots and then "turned around to look to

27

see who it was or what was going on." This witness later testified that he "didn't see the shooting" but saw "people running away from the shooting." Accordingly, the court found, this witness did not see a gun or shots being fired.

¶ 67. This witness said that he approached the victim after the shooting and saw people follow the shooter, running away down the street from the location of the shooting. He did not see defendant running but saw "a tall skinny guy running straight down." He testified that this person was not defendant. He testified that he "just assumed" the person he saw running away was the shooter "because everybody else scattered" and "[t]hey didn't just beeline . . . for it, you know." He reiterated that it was just an assumption on his part. He also acknowledged that the area was not well lit, he could not see the face of the person running, and the only reason the person stood out to him was because he was running.

¶ 68. The second witness testified that he saw defendant at the bar that evening, although he had indicated otherwise in prior interviews. He stated at the hearing that he did not have a clear recollection. This witness said he saw "a taller, skinny, Black gentleman" at the bar who was "pretty riled up in there." He expressed his belief that this person was the shooter. He did not testify to seeing the alleged shooter fire a weapon at the victim later that evening nor did he see a gun. This second witness said he possibly saw the shooter running down a particular alleyway, which was an entirely different direction than that described by the first witness. He later said he did not see which way the shooter went.

¶ 69. In sum, the court found that neither witness saw the shooting and neither saw a gun. Instead, after the shots were fired, they looked in the direction of the gunfire and saw many people running from the scene. Inexplicably, the court continued, the first witness believed that due to the direction one person was running that that person must have been the shooter, even though he saw people running in various directions. The second witness described the same general scene, though he believed a person running in a different direction was the shooter. Although these

28

witnesses were present when police arrived on the scene shortly after the shooting, neither made contact with police following the shooting. These witnesses, who knew defendant, interacted with defendant in correctional facilities. Defendant told one of the witnesses in 2017 that he saw the witness on police body-camera footage at the scene of the shooting.

¶ 70. The court explained that the basis for both witnesses' opinions was that they did not think defendant would commit such a violent crime and that a person they saw running from the scene shortly after the shots were fired did not match defendant's description. The witnesses had differing recollections about the evening, including their movements after leaving the bar where they saw defendant. There were also discrepancies between the statements that the second witness provided to police and his testimony at the hearing regarding whether he saw defendant that night as well as the color of the clothing that the suspect was wearing.

¶ 71. A third individual, who was with the two witnesses that evening, said she was with at least one of the men on Church Street when the shots rang out. She placed their location much farther away from the area of the shooting than the other two witnesses.

¶ 72. The court did not find the testimony of either man particularly credible. Both made statements inconsistent with prior sworn statements, including whether they actually saw the shooting, the description of the person they identified as the shooter, and whether they had actually seen defendant that night. Both expressed a bias in defendant's favor, as they felt defendant was not the type of person who would commit such a crime. While the court found it understandable that a person might not recall all of the details of events that occurred years earlier, both men gave at least four prior statements where they were asked to essentially repeat the most important events of the evening, and even with the benefit of having that testimony read to them to recall events, neither could provide a consistent narrative of the incident.

¶ 73. The court also found it clear that the testimony of both men had limited relevance and would have little or no impact on the weight given to the trial testimony of the eyewitnesses

29

to the shooting. The new witnesses saw defendant at a bar the night of the shooting, but they did not see defendant on Church Steet at the time of the shooting. They were standing at least thirty feet away from the shooting, and perhaps farther. It was dark. They did not see the shooting or the shooter. They did not see a gun or anyone who appeared to be pointing a gun. They did not hear the conversation between defendant and the victim. They could not identify the person who they claimed to be the shooter. The court found their testimony similar to that provided by several trial witnesses who claimed to have seen defendant earlier in the evening but recalled nothing from the actual time of the shooting other than running away from the scene. Security camera footage showed multiple people running from the scene after the shooting.

¶ 74. The court found that defendant's presence at the scene of the shooting was established by other trial witnesses, including by friends of defendant who were also present. One of these friends saw defendant interact with the victim outside on Church Street and saw defendant with a gun in his hand moving toward the victim, describing the movement as "chasing after him." The friend then immediately heard shots. Another friend testified that he was near defendant and the victim when defendant made a forward movement toward the victim, and the friend then heard shots. The trial court had determined, moreover, in denying a motion for judgment of acquittal, that a jury could reasonably conclude based on this and other evidence, that defendant was the shooter.

¶ 75. The court added that it did not find either witness credible as to why they waited until after the trial to provide a statement regarding the events of the incident. Both admitted that they felt defendant was wrongly charged with the shooting. Both also met with defendant at correctional facilities and were therefore aware that defendant had been charged. Similarly, the court was unpersuaded by the claim that the defense could not have obtained this information earlier. According to one of the men, defendant knew in 2017 that the witness was present at the scene based on body-camera footage. Additionally, both men indicated that they had seen and

said hello to defendant at the bar on the evening in question. The court found it reasonable to conclude that defendant would have remembered seeing both men in the club just prior to the shooting and hence included them as possible witnesses for the defense during their initial investigation.

¶ 76. Based on these and other findings, the court considered defendant's motion for a new trial. In reaching its decision, it recognized that "[m]otions for new trial on the ground of newly discovered evidence are not favored by the courts and are viewed with great caution; courts are properly reluctant to grant a second trial once a defendant has had his or her day in court and been fairly tried." State v. Bruno, 2012 VT 79, ¶ 9, 192 Vt. 515, 60 A.3d 610 (quotation omitted). It explained that:

> To succeed on a motion for a new trial based on newly discovered evidence, defendant must prove each of the following elements: (1) new evidence would probably change the result on retrial; (2) the evidence was discovered only subsequent to trial; (3) the evidence could not have been discovered earlier through the exercise of due diligence; (4) the evidence is material; and (5) the evidence is not merely cumulative or impeaching.

Id. ¶ 9. "The test is stringent, and all five elements must be satisfied for the trial court to grant a motion for new trial." State v. Charbonneau, 2011 VT 57, ¶ 16, 190 Vt. 81, 25 A.3d 553 (citation omitted).

¶ 77. The court evaluated each element in detail and concluded that defendant failed to satisfy any of them. We do not repeat the court's analysis as to each element here. With respect to the first element, the court found the proffered evidence not credible given the witnesses' admission to being biased in favor of defendant; their inconsistent statements about the events of that night, where they were standing at the time of the shooting, and who they were with at the time; and it found neither witness credible on the stand based on its observations of their demeanor.

¶ 78. Even if a jury were to find this testimony credible, the court continued, the evidence would not have changed the outcome given the other credible evidence adduced at trial. The court

31

reiterated its findings regarding the new witnesses' testimony—who did not see the shooting or the shooter—and contrasted it with the trial testimony from two eyewitnesses to the shooting who were standing next to defendant and identified defendant as interacting with the victim, holding a weapon, and moving in the direction of the victim just before the shots were fired. The two new witnesses guessed at who they though the shooter was based on that person's flight from the scene and the witnesses described the alleged shooter as fleeing in different directions, suggesting that they had identified two different individuals. Given these and other considerations, the court did not find that the newly discovered evidence would likely lead to defendant's acquittal on retrial. See Bruno, 2012 VT 79, ¶ 10 (explaining that "[i]n assessing whether newly discovered evidence would probably lead to a different result upon retrial, the trial court must evaluate the quality of the evidence presented" and "[d]efendant must show that the new evidence would likely lead to an acquittal of the defendant on retrial" (quotation omitted)).

¶ 79. Although the failure to satisfy this first element was fatal to defendant's motion, the court considered each of the remaining elements in detail as well. It concluded that defendant failed to show that: the evidence was unknown to him at the time of trial; he could not have discovered the evidence before trial through the exercise of due diligence; the proffered evidence was material; or that the evidence was not merely cumulative or impeaching. It thus denied defendant's motion.

¶ 80. We review the court's decision for abuse of discretion, id. ¶ 16, and we find none. Defendant erroneously suggests that the court denied his motion based solely on his failure to satisfy the first element. Defendant does not appear to expressly challenge the court's conclusions regarding the remaining elements—all of which must be satisfied—and the trial court's decision can be affirmed on this basis alone.

¶ 81. In any event, defendant's challenge to the first element is without merit. According to defendant, the evidence against him was largely circumstantial, and the two new witnesses

32

testified that they saw a tall thin man with his hand held out in the proximity of the muzzle flash who was not defendant. Defendant asserts, in a conclusory fashion, that this testimony would have changed the outcome of the case. As set forth above, however, the court found that neither witness testified at the hearing that they saw the shooting and the court so found. Defendant's argument thus rests on a faulty premise. The court's conclusion as to why the proffered evidence would probably not change the outcome is well supported by its findings.

¶ 82. Defendant also asserts that the court erred in assessing the credibility of these witnesses and that it should not have been troubled by inconsistencies in their testimony. We leave credibility assessments to the factfinder, however, and we do not reassess credibility on appeal. See, e.g., State v. Woolbert, 2007 VT 26, ¶ 9, 181 Vt. 619, 926 A.2d 626 (mem.) (recognizing that "[t]rial courts are in a unique position to assess the credibility of witnesses" and "[i]t is not our role to second-guess a court's decision as to whom to believe"). We note that the court here explained why it considered the testimony not credible and why it considered such testimony cumulative to evidence presented at trial. Defendant also asserts that these witnesses had no motive to lie, yet the trial court specifically found that they expressed a bias in defendant's favor. Defendant fails to show that the court abused its discretion in denying his motion for a new trial.

Affirmed.

FOR THE COURT:

_____

Associate Justice